**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

SIERRA CLUB,

               Plaintiff,

vs.                                     Case No. 3:05-cv-362-J-32TEM

UNITED STATES ARMY CORPS
OF ENGINEERS, et al.,

               Defendants.

_____

NATURAL RESOURCES DEFENSE COUNCIL,

               Plaintiff,

vs.                                     Case No. 3:05-cv-459-J-32TEM

UNITED STATES ARMY CORPS
OF ENGINEERS, et al,

               Defendants.

_____

## <u>FINAL ORDER</u>

On June 30, 2004, defendant United States Army Corps of Engineers ("Corps")

issued SAJ-86, a regional general permit ("RGP"), which contemplates the dredge

and fill of wetlands to accommodate development in a 48,150 acre region in

Northwest Florida.  Plaintiffs Sierra Club and Natural Resources Defense Council filed

suit against the Corps and two Corps officials in April and May of 2005[1] seeking to enjoin the Corps from authorizing the dredge and fill of any wetlands pursuant to SAJ-86, claiming that the Corps' issuance of this permit was in violation of both the Clean Water Act of 1977, 33 U.S.C. §§ 1251, *et seq.* ("CWA"), and the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* ("NEPA"), and various attendant regulations.  During the course of these proceedings, the parties debated whether this regional general permit represents good environmental policy and whether the Corps should use its permitting authority to authorize activity of the scope and scale contemplated here.  However, the Court does not join this debate as the Court's sole task is to determine whether the Corps' issuance of this permit is in compliance with the law.  Having now considered this case on a full record, I find, by the slimmest of margins, that the Corps' issuance of regional general permit SAJ-86 does not violate the statutory and regulatory requirements of either the CWA or NEPA.  I will therefore be vacating the previously issued preliminary injunction (Doc. 72) and entering judgment for the Corps in both consolidated cases.

---

[1]On August 19, 2005, the Court consolidated these two cases (see Order, Doc. 44 in the Sierra Club case (3:05-cv-362-J-32TEM) and Doc. 42 in the Natural Resources Defense Council case (3:05-cv-459-J-32TEM)) and virtually all filings following that date have been filed in the Sierra Club case only.  All documents referenced in this Order are located in the Sierra Club case unless otherwise noted.

## I. Background

The region covered by SAJ-86 is a 48,150 acre parcel along U.S. Highway 98 in Florida's panhandle.  Intervenor St. Joe Company, Inc. owns more than 75 % of the land covered by the permit and much of St. Joe's business there has focused on silviculture (pine tree production), an industry that has dominated the region since the 1920s.  In response to expanding population growth in the area, St. Joe has modified its business plan to include commercial and residential development.  Because the region's landscape is permeated with wetlands, which account for approximately 60% of the land area, most of these developments require a CWA permit so that wetlands can be dredged or filled to accommodate the development.

Under the CWA statutory scheme, the Corps is the agency that issues CWA permits for the dredge and fill of navigable waters, which can include wetlands.  33 U.S.C. § 1344.  Rapanos v. United States, 126 S.Ct. 2208 (2006).  The Corps may issue either an individual or a general permit for this purpose.  An individual permit is issued to allow the dredge and fill of wetlands for a single specific project that is subject to public review and input and whose details and plans meet numerous Corps guidelines and standards.  33 U.S.C. § 1344(a).  A general permit, on the other hand, is issued on a national, regional, or statewide basis and allows the dredge and fill of wetlands for an entire category of activities, provided that the activities are similar in nature and will cause only minimal adverse environmental effects, both separately

3

and cumulatively. 33 U.S.C. § 1344(e). Like an individual permit, issuance of a general permit is subject to Corps standards and guidelines and public input and review. However, usually once a general permit has issued, a landowner seeking to conduct activities in conformity with a general permit's terms need only secure an "authorization" from the Corps before beginning dredge and fill activities. This authorization process is far less onerous than the original permitting process.

In 2000, after noting an increase in individual permit applications from St. Joe for development projects in northwest Florida, the Corps initiated discussions with St. Joe and other federal and state agencies regarding the possibility of arriving at a regional development plan through use of a general permit that would guide growth in a manner which maximized protection of wetlands on a larger scale than would be possible on an individual project-by-project basis.[2] Over the next few years, the Corps, St. Joe, and several state and federal agencies cooperatively developed a plan for wetlands management in the area, the result of which was the Corps' June 30, 2004 issuance of regional general permit SAJ-86.[3] By all accounts, SAJ-86 is

---

[2]Silviculture activities, like farming and ranching, are generally not subject to the Corps' permitting or regulations, notwithstanding that such activities may impact wetlands. 33 C.F.R. § 323.4(a). Thus, it was only the change in St. Joe's business plan to include residential and commercial development (activities that require permits) that brought St. Joe's activities to the attention of the Corps.

[3]The permit is part of the 4,434 page administrative record ("AR") of this case, a copy of which is on a CD-Rom filed as Doc. 118. The permit can be found at AR 3876-91 and is also attached in hardcopy to several other documents in the file,

unique and unprecedented in that it covers an extraordinarily large land area (over 75 square miles) in comparison to other regional general permits and because a single landowner (St. Joe) owns an overwhelming proportion of the land covered by the permit (over 80%) and has specific rights and obligations under the permit terms that do not apply to the other landowners who own property within the RGP area.  Tr.[4] 30-39.  See too, AR 3636 (comment by Corps' project manager for SAJ-86 (Gordon Hambrick) that permit "would be largest in Florida for the types of activities [ ] described"; stating he was "not aware of any similar RGPs having been developed in any of the other Corps Districts in the nation").

Under SAJ-86, landowners can dredge or fill wetlands to construct residential, commercial, recreational and institutional projects in the regional general permit area. However, the amount of wetlands dredged or filled as a result of these construction activities are limited in the following ways:  first, impacts to "high quality" wetlands[5] throughout the permit area are limited to 125 total acres; second, impacts to "low quality" wetlands are limited to 20% of the wetlands in any one of nineteen different

including Doc. 52, at Exhibit 6.  References to "SAJ-86," "the RGP," "regional general permit," and "the permit" are one and the same.

[4]"Tr." cites are to the transcript of the February 16, 2006 hearing in this case filed as Doc. 129.

[5]For purposes of SAJ-86, the Corps defines low quality wetlands as wetlands planted with pine trees and ditches; high quality wetlands are all other wetlands.  SAJ-86, Special Condition 4 (AR 3877).

geographic sub-basins;[6] third, all lost wetlands are to be mitigated either through on-

site mitigation or through two off-site mitigation banks;[7] and fourth, the permit

designates up to 13,200 acres of land as "conservation units," which land St. Joe (the

---

[6]Run-off in each of the nineteen sub-basins drains into one of three basins, or watersheds:  the Lake Powell watershed, the Choctawhatchee Bay watershed (also referred to as the Devil's Swamp basin) and the West Bay watershed (also called the Breakfast Point basin).  The geographic boundaries of each of the nineteen sub-basins were negotiated between the Corps and St. Joe to accommodate St. Joe's anticipated development needs and the Corps' interest in protecting natural waterflow patterns in the permit region.

[7]The two off-site mitigation banks (Devil's Swamp and Breakfast Point), both of which are owned by St. Joe, were separately permitted using nationwide and state permits in 2004. As explained in the two Mitigation Bank Instruments included in the permit, a "state permit authorizes the mitigation bank implementation and operation, as well as the dredge and fill activities associated with it" whereas federal regulatory compliance by way of a Mitigation Bank Instrument "requires an additional authorization for the actual dredge and fill activities associated with the bank, which will be in the form of a Nationwide Permit 27." AR 3931 (Breakfast Point Mitigation Bank Instrument), 4091 (Devil's Swamp Mitigation Bank Instrument).  The mitigation bank acreage (7,685 acres) is included in the 48,150 acre figure given for the RGP area, even though the mitigation banks are not part of the area in which permitted projects will occur (and the Devil's Swamp Mitigation Bank is not even within the contiguous SAJ-86 permit area, but is approximately 1/2 mile away at its closest point). AR 3802, AR 3845.  The mitigation banks are composed of approximately 2,123 acres of upland and 5,829 acres of wetlands. AR 3845. (There is a 267 acre differential between the mitigation bank acreage reported at AR 3802 and at AR 3845, which is apparently due to the addition of acreage from the "mitigation outparcel" referenced at AR 3845.)  Under SAJ-86, a landowner earns (or buys) mitigation "credit" by restoring or enhancing wetland acreage either on-site or at a mitigation bank.  The number of credits a landowner has is determined according to a formula set forth in the RGP (see Special Conditions 11, 13, AR 3878-80), which then dictates the amount of mitigation "debits" or wetland acres, that can be dredged or filled, not to exceed the 20% limit in each sub-basin. Both on-site and off-site mitigation require the landowner to convey perpetual conservation easements to the Florida Department of Environmental Protection.

6

owner of the 13,200 acres) is to ultimately place into conservation by granting

easements to the Florida Department of Environmental Protection ("DEP") for the

perpetual protection of those acres.[8]  AR 3802, AR 3880-82.  The permit contains

numerous other terms that do not directly affect the amount of wetlands to be dredged

_____

[8]The permit designates 13,200 acres of land as part of ten conservation units, land specifically designated for conservation in a largely contiguous area crossing all three of the main basins and several of the sub-basins. AR 3872, 4426. The conservation unit land is composed of both high and low quality wetlands (10,084 acres) as well as uplands (3,116 acres).  AR 3845, 3872, 4426.  To the extent that land in the designated conservation unit area involves wetland restoration or enhancement based activities, that land, once conveyed, may "count" as a landowner's on-site mitigation in accordance with the RGP debit/credit formula, provided the conservation unit area is on-site.  AR 3807.  Although St. Joe alone now owns the areas designated for conservation units, the parties contemplate that other landowners may make arrangements with St. Joe to use land designated for conservation as part of a landowner's on-site mitigation plans (just as those landowners could make arrangements with St. Joe to "buy credit" at St. Joe's mitigation banks). The permit requires St. Joe to convey conservation easements over land in the designated conservation units (whether that land is upland or wetland) at an annual rate tied to the percentage of total acreage of wetlands impacted each year by all authorized projects (regardless of whether they are "St. Joe projects" or not), and to do so in accordance with Florida law. See Fl. Stat. 704.06.  AR 3880-81, Tr. 115-16.  Using that formula, the full 13,200 acres of conservation unit land would be placed under perpetual protection by the time the regional general permit area is fully developed.

Apart from the 13,200 acres of conservation units, additional lands will be permanently conserved under the permit because the permit further requires that 80% of the wetlands within every sub-basin be preserved and placed into perpetual conservation, leaving 20% available for development (excepting for those few sub-basins which are wholly contained within a mitigation bank in which case no wetlands are available for development).  The area within a sub-basin used to calculate these percentages does not include any designated conservation unit areas.  Special Condition 5(a) and (d), AR 3877-78.  Thus, for the sub-basins containing designated conservation unit areas that contain wetlands (which is most of the sub-basins), more than 80% of the wetlands will be preserved.

or filled but that otherwise affect the impact of construction activities on wetlands and the environment generally, such as wetland buffer requirements, restrictions on the type of wetland fill that can be used, septic tank and drainfield prohibitions, required methods of storm-water management for new construction projects, and limits to the placement of road crossings.  The permit also contemplates the execution between St. Joe and the DEP of a 30 page Ecosystem Management Agreement ("EMA"),[9] the conditions of which are specifically incorporated into SAJ-86 as special conditions applicable to St. Joe.  Special Condition 1, AR 3876.  Among these conditions is that the EMA (and by extension, the RGP) will serve as the exclusive mechanism for St. Joe to initiate the types of activities authorized by the permit within the 31,369 acres (the total acreage St. Joe owns in the RGP area) covered by the EMA.

Under SAJ-86, developers, including St. Joe, and others seeking to build residential, commercial, recreational and institutional projects that impact wetlands within the permit area apply to the Corps' District Engineer who may authorize individual projects upon finding them to be compliant with the terms of SAJ-86.[10]

_____

[9]A copy of the draft EMA with over 400 pages of exhibits is in the record at AR 3104-3563.  The draft EMA is also an exhibit to the RGP at AR 4292-4322 and nearly all of the EMA's exhibits are incorporated into the RGP as exhibits to it as well.  A copy of the executed EMA, entered into on October 11, 2004, is available as a link on the DEP's website, www.dep.state.fl.us./northwest (last visited Nov. 14, 2006).

[10]Development projects in the RGP area that will not involve the dredging or filling of any wetlands do not require Corps authorization.

8

Review of proposed projects for authorization includes review of the proposed mitigation plans for wetlands that will be dredged or filled by the project. Authorization for a project may also be conditioned upon the satisfaction of additional terms set forth by the District Engineer to minimize adverse environmental impacts. Special Condition 21, AR 3886. Notwithstanding the existence of SAJ-86, an owner of land within the permit boundaries is not required to seek authorization under the permit for projects impacting wetlands, even where the proposed projects would be covered by SAJ-86. Rather, a landowner may still, at its own option, apply for an individual permit to dredge and fill within the regional general permit area or could seek authorization under a different general permit, such as Nationwide Permit ("NWP") 39, that applies to the type of project otherwise authorized by SAJ-86.[11,12] These options, however, would not apply to St. Joe, which is obligated by the terms of the EMA to use the EMA and RGP exclusively for construction activities covered by the permit.[13]

──────────────────

[11]Under proposed modifications to NWP 29 and 39, residential development would be authorized by NWP 29 and commercial and institutional development would be authorized by NWP 39. 71 Fed.Reg. 56258, 56269-70, 56271 (Sept. 26, 2006).

[12]Securing either an individual CWA permit or authorization from the Corps under a CWA general permit does not affect a landowner's duty to comply with myriad other federal, state, and local laws and regulations before construction can begin.

[13]Although the EMA boundary included the entirety of St. Joe's holdings within the RGP area at the time the EMA and RGP issued, if St. Joe acquired additional land within the RGP area, such land would not be covered by the EMA. Additionally, the EMA does not prevent St. Joe from seeking authorization under an existing general permit or in applying for an individual permit to engage in activities not covered by

In April and May of 2005, the plaintiffs filed suit against the Corps and two Corps officials.  The complaints allege that the Corps violated the CWA because SAJ-86 is beyond the scope of the CWA's general permitting scheme; the Corps failed to comply with the CWA statutory requirements and related regulatory requirements that a general permit issue only for categories of activities that are similar in nature; the Corps failed to comply with the CWA statutory requirement and its implementing regulatory requirements that a general permit issue for categories of activities that will cause only minimal adverse environmental effects (most particularly because the Corps relied on mitigation in reaching this finding); the Corps failed to follow the Environmental Protection Agency ("EPA")'s 404(b)(1) Guidelines in implementing the CWA as it applies to SAJ-86; and the Corps failed to engage in an appropriate analysis of the public interest review factors as required by its regulations.  Plaintiffs also claim that the Corps' issuance of SAJ-86 violates NEPA because the Corps failed to take the required "hard look" at the environmental impacts of the activities authorized by the permit when it did not fully engage in the required alternatives analysis, and failed to consider the direct, indirect, and cumulative effects of the permit activities on the human environment, all of which resulted in the Corps making an unsupported "Finding of No Significant Impact" under NEPA.  Many of these issues raise additional sub-issues as further described below.  In their complaints, the

---

SAJ-86.

plaintiffs ask the Court to declare void and invalid the permit itself as well as any project authorizations previously issued pursuant to the permit; and, alternatively, to enjoin the Corps from issuing further project authorizations until it has complied with the statutory and regulatory requirements of the CWA and NEPA.

In August 2005, plaintiffs filed motions for preliminary injunction seeking to enjoin the Corps from issuing any new authorizations pursuant to SAJ-86 and to stop further construction of those projects already authorized under the permit.[14] Following further briefing and a hearing, the Court granted preliminary injunctive relief, finding that the plaintiffs had preliminarily demonstrated a substantial likelihood of showing that the Corps' issuance of SAJ-86 violated the CWA's requirement that general permits issue only for categories of activities that are similar in nature and that will have minimal adverse environmental effects. See Order, Doc. 72. The Court did not address any of the plaintiffs' other arguments and in its decision, the Court reminded the parties that its preliminary ruling was subject to revision or reversal in a final order. Id. at 3. The parties filed supplemental briefs and on February 16, 2006, the Court held an all-day final hearing, the record of which is incorporated by reference (Doc. 129). The parties then filed another round of briefs. Bespeaking the

--------------------

[14]According to plaintiffs, even though the Corps issued SAJ-86 on June 30, 2004, plaintiffs delayed filing suit and bringing the preliminary injunction motions because the permit was being challenged in state proceedings, which proceedings were then followed by settlement efforts (that obviously failed).

11

difficulty and complexity of the issues presented, the Court, after having taken the matter under active advisement, issued an Order requiring the parties to respond to additional questions, which they have now done.  This matter is now ripe for a final decision on the merits.

## II.  Standard of Review

The Corps' decision to issue SAJ-86 and its compliance with the CWA and NEPA is subject to review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  Under this standard, the Court must set aside action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[15]  Wilderness Watch and Pub. Employees for Envtl. Responsibility v. Mainella, 375 F.3d 1085, 1088 (11th Cir. 2004).  An agency action is arbitrary and capricious within the meaning of the APA where the "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). The Court accords "particular deference" to an agency's informed decision "where

_____

[15]No party has suggested that this controversy is controlled by any other subsection of the APA statute.  See 5 U.S.C. 706(2)(B)-(F).

12

issues of science, technical expertise or complex environmental statutes are involved." <u>Florida Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs</u>, 374 F.Supp. 2d 1116, 1127 (S.D. Fla. 2005) (citing <u>Marsh v. Oregon Natural Res. Council</u>, 490 U.S. 360, 377 (1989); <u>Envtl. Coalition of Broward County, Inc. v. Myers</u>, 831 F.2d 984, 986 (11th Cir. 1987)).

This standard gives a reviewing court "very limited discretion to reverse an agency's decision." <u>City of Oxford, Ga. v. F.A.A.</u>, 428 F.3d 1346, 1352 (11th Cir. 2005). Nonetheless, judicial review must be "searching and careful," ensuring that the agency decision "was based on a consideration of the relevant factors" and that there have been no "clear error[s] of judgment." <u>Sierra Club v. Johnson</u>, 436 F.3d 1269, 1273-74 (11th Cir. 2006) (quoting <u>Fund for Animals, Inc. v. Rice</u>, 85 F.3d 535, 541 (11th Cir. 1996)). This inquiry "requires the court to consider not only the final documents prepared by the agency, but also the entire administrative record." <u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 295 F.3d 1209, 1216 (11th Cir. 2002) (quotation and citation omitted).[16] In reviewing agency action under the APA, "due

_____

[16]When necessary, the Court's review may also include consideration of evidence outside of the administrative record, such as when an agency has failed to adequately explain its action or when technical terms or complex subjects need to be explained. <u>Preserve Endangered Areas of Cobb's History, Inc. ("P.E.A.C.H.") v. U.S. Army Corps of Eng'rs</u>, 87 F.3d 1242, 1246-47, n.1 (11th Cir. 1996). <u>See also</u>, <u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 935 F.Supp. 1556, 1566-68 (S.D. Ala. 1996) (discussing Eleventh Circuit standard under <u>P.E.A.C.H.</u>, 87 F.3d 1242, and applying it to extra-record evidence under APA to address NEPA and CWA challenges). Here, the plaintiffs and St. Joe submitted extra-record evidence and at the final hearing, at the

account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706.  <u>See</u> <u>Sierra</u>

<u>Club v. Slater</u>, 120 F.3d 623, 637 (6th Cir. 1997) (finding Ohio EPA decision due to be

affirmed under the APA where plaintiff's "nitpicking" argument regarding technical

failure to comply with regulations resulted in no prejudice).  However, the prejudicial

error doctrine is to be used only in the "clear" absence of prejudice.  <u>U.S. Steel Corp.</u>

<u>v. U.S. E.P.A.</u>, 595 F.2d 207, 215 (5th Cir. 1979)[17] (rejecting application of prejudicial

error doctrine where EPA's failure to publish pre-promulgation notice affected

plaintiff).

Additionally, in addressing whether an agency has acted in accordance with law

in interpreting a statute it is charged with administering, the Court must use the two-

step analysis described in <u>Chevron, U.S.A., Inc. v. Natural Resources Defense</u>

<u>Council, Inc.</u>, 467 U.S. 837 (1984).  First, the Court determines "whether Congress

has directly spoken to the precise question at issue." <u>Chevron</u>, 467 U.S. at 842.

---

Court's request, the Corps provided testimony from Gordon A. Hambrick, III, the
Corps' Project Manager for SAJ-86, and a signatory to the Memorandum for Record
(AR 3801-73) created in support of SAJ-86. The Corps has objected to the Court's
consideration of any evidence outside the official administrative record. However,
under the standard announced above, the Court finds that in this case, it is
appropriate to consider some of the extra-record evidence provided and it has done
so within permissible confines. To the extent the Corps' has moved to exclude any
extra-record evidence relied on in this opinion, that motion is denied.

[17]Decisions issued by the Fifth Circuit prior to October 1, 1981 serve as binding
precedent in the Eleventh Circuit. <u>Bonner v. City of Prichard, Ala.</u>, 661 F.2d 1206,
1207 (11th Cir. 1981).

14

"Then, if Congress' intent is clear from the statutory language, [the Court] must give effect to it." Johnson, 436 F.3d at 1274 (citing Chevron, 467 U.S. at 842-43). Congressional intent is examined through traditional tools of statutory construction. Wilderness Watch, 375 F.3d at 1091-93; Chevron, 467 U.S. at 843, n.9. Second, "'[i]f the statute is silent or ambiguous with respect to the specific issue,'" the court then defers to the agency interpretation if "the agency based its interpretation on a permissible construction of the statute." Johnson, 436 F.3d at 1274 (quoting Chevron, 467 U.S. at 843). The Court "'need not conclude that the agency construction was the only one it permissibly could have adopted' or even that [the Court] would have interpreted the statute the same way that the agency did." Id. (quoting Chevron, 467 U.S. at 843, n.11). However, Chevron deference is to be accorded "'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" Gonzales v. Oregon, 126 S.Ct. 904, 915 (2006) (quoting United States v. Mead Corp., 533 U.S. 218, 226-27 (2001)). "Otherwise, the interpretation is 'entitled to respect' only to the extent it has the 'power to persuade.'" Id. (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)). The persuasive value to be accorded an agency's interpretive decision depends on its "thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight." Mead, 533 U.S. at 235.

15

Finally, where an agency has promulgated regulations and procedures for implementing a statutory scheme, the agency must "scrupulously follow" those regulations and procedures. Sierra Club v. Martin, 168 F.3d 1, 4 (11th Cir. 1999).  An agency decision issued without adherence to its own regulations must be overturned as arbitrary and capricious.  Id.  If interpretation of an agency's regulation is at issue, the Court must defer to the agency's interpretation "unless plainly erroneous," "inconsistent with the regulation," or if the agency has "promulgate[d] 'a parroting regulation' that does nothing more than 'paraphrase the statutory language' that it should be implementing." Johnson, 436 F.3d at 1274 (quoting Gonzales v. Oregon, 126 S.Ct. 904, 916 (2006).

## III.  Discussion

**A.      SAJ-86's Compliance with the Clean Water Act**

The Clean Water Act of 1977 was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."   33 U.S.C. § 1251(a).  To that end, the CWA requires a party to secure a permit from the Corps before discharging dredged or fill material into navigable waters.  33 U.S.C. § 1344. As noted above, the Corps regulates the discharge of dredge or fill material into navigable waters of the United States by issuing one of two types of permits- - either an individual permit (sometimes also referred to as a "standard" permit) or a general

permit.[18]

Individual permits may be issued "following a case-by-case evaluation of a specific project involving the proposed discharge(s)."  33 C.F.R. § 323.2(g).  An individual permit applicant provides the Corps with, inter alia, "a complete description of the proposed activity including necessary drawings, sketches, or plans" and "the location, purpose and need for the proposed activity" and includes descriptions of "[a]ll activities which the applicant plans to undertake which are reasonably related to the same project." 33 C.F.R. § 325.1(d).

Following receipt of an application for an individual permit, the Corps issues a public notice to solicit comments and other information from the interested public regarding the activities proposed to be authorized under the permit.  33 C.F.R. §§ 325.2(a)(2), 325.3(a).  The Corps will then consider public comments (33 C.F.R. § 325.2(a)(3)); conduct a public hearing if deemed necessary (33 C.F.R. § 325.2(a)(5)); undertake the required NEPA review (which includes taking a "hard look" at the environmental impacts of the activities authorized by the permit by engaging in an analysis of alternatives to issuing the proposed permit, and considering the direct, indirect, and cumulative effects of the permit activities on the human environment,

---

[18]The Corps can also authorize dredge and fill activities through issuance of a "Letter of Permission," or "LOP," an "abbreviated processing procedure" further described at 33 C.F.R. §§ 325.2(e)(1), 325.5(b)(2). No party has suggested that such course would have been appropriate here.

resulting in nearly all cases in either an EIS (Environmental Impact Statement) or an EA (Environmental Assessment)) (33 C.F.R. § 325.2(a)(4))[19]; and analyze the effects of the activities proposed on the public interest, which shall include an assessment of the impacts based on guidelines promulgated by the EPA and the Corps pursuant to the CWA (the 404(b)(1) guidelines) which guidelines involve, <u>inter</u> <u>alia</u>, consideration of the long and short term effects of proposed discharges on a number of different criteria related to the aquatic ecosystem and environment such as the secondary effects and individual and cumulative effects on water current patterns, circulation, fluctuation, salinity, suspended particulate/turbidity, and contaminants. <u>See</u> 33 U.S.C. § 1344(b); 33 C.F.R. § 325.2(a)(6), 40 C.F.R. Part 230.  Upon completing this evaluation, the Corps then reaches a decision to either deny or issue the individual permit, documenting its findings in a written memorandum (33 C.F.R. 325.2(a)(6)).  If the Corps determines to issue an individual permit, the approved application is then forwarded to the applicant for signature and acceptance of all conditions upon which the permit issued, at which point the applicant can then engage in dredge and fill activities consistent with the permit.

In addition to individual permits, which issue for specific individual projects, the Corps may also issue general permits "on a State, regional, or nationwide basis for

---

[19]Some proposed activities may fall into "a categorical exclusion," (<u>see</u> 33 C.F.R. § 230.9; 33 C.F.R. Pt. 325, App. B, ¶6), in which case the Corps need not prepare either an EA or an EIS.

any category of activities involving discharges of dredged or fill material if the Secretary [of the Army, acting through the Chief of Engineers] determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1).

Unlike individual permits, the issuance of general permits do not occur at the instigation of any particular applicant.  Rather, upon provisionally determining that certain anticipated dredge and fill activities would meet the criteria for issuance of a general permit, the Corps itself, acting through its division or district engineers, can propose a new general permit.  And, again unlike the individual permit process, because no particular applicant is the sponsor of a general permit and no particular projects are proposed in advance, the general permit development process does not require the advance submission of specific plans, descriptions, locations, purposes or needs of anticipated projects.  Once proposed, however, the process for issuance of a general permit is the same as that for the issuance of an individual permit:  the Corps issues a public notice, solicits public comments, conducts a public hearing when necessary, undertakes the required NEPA review generally resulting in an EA or an EIS, and analyzes the effects of the proposed activities on the public interest factors, which includes an assessment of the impacts based on the 404(b)(1)

guidelines,[20] all of which is incorporated into a written memorandum.  After the Corps issues a general permit, an applicant seeking to discharge dredge or fill materials into wetlands or other navigable waters can often immediately begin those activities without notice to or authorization by the Corps.  A general permit's terms, however, may require an applicant to notify the Corps of proposed dredge and fill activities or to secure Corps approval for such activities, which approval may be subject to the applicant's satisfaction of additional conditions set by the Corps.  See e.g., 33 C.F.R. § 325.4(a); 33 C.F.R. § 325.5(c)(1); 33 C.F.R. § 330.2(c).

Here, the Corps proposed SAJ-86, a regional general permit ("RGP"), upon provisionally determining that the proposed activities satisfied the statutory requirements for issuance of a general permit (33 U.S.C. §1344(e)) because residential, commercial, recreational and institutional development in southeastern Walton County and southwestern Bay County were a "category of activities [that were] similar in nature" in that they were components which typically comprise suburban development;  and that these activities would "cause only minimal adverse environmental effects when performed separately, and [would] have only minimal cumulative adverse effect on the environment" because the proposed permit's special

---

[20]An analysis of 404(b)(1) guidelines compliance is apparently not required for all nationwide general permits, 33 C.F.R. § 330.5(b)((3), but is required for issuance of regional general permits.  See 33 C.F.R. §325.2(e)(2) (directing compliance with "other procedures of this regulation" before issuance of regional general permits).

conditions limited the amount of wetlands acreage that could be dredged or filled and provided for mitigation of lost wetlands acreage.  The Corps issued a public notice regarding SAJ-86 on August 29, 2003 (sent to Sierra Club and others), solicited public comments (including from Sierra Club), and held public hearings on September 24, 2003 and January 12, 2004.  AR 3807-08.  The Corps prepared a written document (a Memorandum for Record, AR 3801-3873) describing its consideration of alternatives as part of its NEPA review (AR 3815-3817), its analysis of the 404(b)(1) guidelines criteria (AR 3817-3839) and the public interest factors (AR 3839-3870), resulting in an environmental assessment that the proposed permit would result in no significant impact (the "FONSI" finding) under NEPA (AR 3870) and would not be contrary to the public interest (AR 3871).  The Corps then issued SAJ-86 on June 30, 2004.

Under the terms of SAJ-86, a prospective applicant seeking to engage in dredge and fill activities must first appear at a pre-application meeting at which the applicant, the Corps, and other federal and state agencies will review the proposed project to evaluate its scope and location; identification and delineation of wetlands, wetlands maps, proposed wetland impacts; stormwater management systems; state historic preservation; and flatwoods salamander, bald eagle, and telephus spurge documentation.  Special Condition 20(a), AR 3885-86.  Following the pre-application meeting, a landowner can then submit an application, which includes a final form of

exhibits and information considered at the pre-application meeting.  If a proposed project fails to meet the terms of the RGP, it could be submitted for consideration as an individually permitted project, to be evaluated in accordance with the individual permit application process outlined above.  If, on the other hand, the Corps determines that a proposed project does meet the RGP terms, the Corps will then issue a letter of authorization.  Such letters can be conditioned upon the satisfaction of additional special conditions deemed necessary to minimize adverse environmental impacts.  AR 3886.  Upon receipt of an authorization letter, a landowner can then undertake dredge and fill activities in the RGP area.  Prior to the issuance of the Court's preliminary injunction, the Corps had issued at least five such authorization letters to landowners to allow dredging and filling of wetlands in the RGP area.[21]

Plaintiffs claim the Corps failed to comply with the CWA when it issued SAJ-86 because (1) the scope of SAJ-86 is beyond that contemplated by the CWA's general permitting scheme; (2) the permit fails to describe a category of activities that are "similar in nature"; (3) the permit activities will cause more than "minimal" adverse effects to the environment, both individually and cumulatively; (4) the Corps failed to

_____

[21]The Court's November 10, 2005 Order preliminarily enjoined both the Corps and St. Joe from proceeding further with any dredge and fill activities at "WaterSound North," one of the five projects for which the Corps had issued an authorization letter. The Court declined to enjoin any other dredge and fill activities already authorized but did enjoin the Corps from issuing any new authorizations under the permit until further Order. See Order, Doc. 72.

adequately address the required criteria of the 404(b)(1) guidelines; and (5) the Corps

failed to adequately consider the public interest review factors of 33 C.F.R. §

320.4(a).[22]

   **(1)   Is SAJ-86 beyond the scope of CWA's general permitting scheme?**

   Plaintiffs argue generally that SAJ-86 "obliterates" the CWA's distinction

between general and individual permits in that SAJ-86 contemplates projects of a type

and size that are typically permitted individually and that, by authorizing such projects

under the auspices of a general permit, SAJ-86 projects avoid the level of scrutiny

with which projects are reviewed under the individual permitting scheme, thus

undermining the policy reasons for having the two categories of permits in the first

place.  In support, plaintiffs cite to two features of other general permits they argue

are missing from the RGP here.  First, plaintiffs claim the category of activities of most

general permits is so narrowly defined that the impacts of such projects are virtually

guaranteed to be minimal.  Plaintiffs cite to nationwide permits such as those for utility

lines (NWP 12), navigation aids (NWP 1) and small boat ramps (NWP 36) as

examples of the types of projects usually authorized by a general permit.  Second,

plaintiffs note that most nationwide permits provide relatively small and very specific

_____

[22]Although the Corps' CWA permitting regulations obligate it to follow NEPA, the issues regarding the Corps' NEPA compliance are addressed separately both because they implicate a different statute and additional regulations and because a NEPA violation could result in a different remedy than would a violation of the CWA.

(1/4 - 1/2 acre) limits to the amount of wetlands that can be destroyed by authorized projects, thus further guaranteeing that authorized projects will have minimal impact to wetlands.

By contrast, the projects to be authorized by SAJ-86 range from hospitals to business parks to golf courses, and the limits to the actual amount of wetlands to be impacted by those and other projects varies from sub-basin to sub-basin, limited only by the 125 total acre limit to high quality wetlands and the 20% limit per sub-basin to low quality wetlands. In these respects, plaintiffs contend that the RGP is serving as a "catch-all" for nearly any and all dredge and fill activity to be conducted in this vast geographic area, resulting in projects of a type and size otherwise only authorized by individual permits but which now escape the level of review to which individually permitted projects are subjected. Instead, say plaintiffs, the only review SAJ-86 projects ever receive comes from the Corps during the *post-permit* authorization process, which process excludes any opportunity for public input and, most importantly, never requires a landowner to attempt to minimize impacts to low quality wetlands at all, provided that proposed projects do not exceed the 20% low quality wetlands impact threshold.[23]   Thus, unlike the individual permit process, which

---

[23]SAJ-86 does require a landowner to make certain specific showings as to the need for impact to any of the 125 acres of high quality wetlands. <u>See</u> Special Condition 5.c, AR 3877-78. Although plaintiffs take issue with the differentiation between low and high quality wetlands, they have not specifically argued that the wetlands designated as high quality are not sufficiently protected by SAJ-86.

requires a landowner to show that there are no alternatives to the project which would result in lesser or no impact to wetlands, plaintiffs argue that St. Joe, as well as any of the other landowners, never has to explain why a certain project could not be relocated or downsized in a manner that would have a lesser impact to wetlands. Plaintiffs argue that SAJ-86 functions as a tool for St. Joe to avoid the alternatives analysis of the individual permit process and that, in essence, St. Joe has "bought" itself an exemption by offering to conserve vast areas of land within its holdings in exchange for enjoying the freedom to develop the remainder of its land in any manner it sees fit, without the burdens of compliance with the CWA individual permitting process.  Finally, plaintiffs fear that if the Court upholds SAJ-86, it will serve as a model for other landowners to negotiate similar development rights with the Corps through regional general permits.[24]

The Corps admits it is not aware of ever having issued an RGP on this scale before.   As stated by the Corps, in this instance, it "has used its discretion to customize the procedural requirements of a general permit to best suit the nature of the particular activity involved."  Doc. 52 at 5.  See also, AR 3869 (statement by Corps that the proposed RGP "would be a holistic approach to the review of the numerous projects proposed for the area").  Additionally, there is evidence in the Administrative

---

[24]Plaintiffs also state (without citation) that if this permit is upheld St. Joe may attempt to use general permits of this kind to develop its other 800,000 acres of property.

Record that the Corps is interested "in us[ing] this process in other geographic areas." AR 115 (West Bay to East Walton Wetland Permitting Strategic Plan).[25] But see, AR 3636 (comment by Corps' project manager for SAJ-86 (Gordon Hambrick) that he was "not aware" of "the likelihood of any other Districts" issuing such permits). However, whether this use and future like uses of regional general permits are unprecedented is beside the point because, as noted above (and further discussed below), this Court's review is limited to determining whether the statutory and regulatory requirements for issuance of this permit have been met and does not include a judgment of whether using RGPs in this way makes sound regulatory policy.

The general permitting provisions were added to the Clean Water Act by Congressional amendment in 1977 to reduce the administrative paperwork and delay otherwise caused by having the Corps review every proposed dredge or fill activity under the individual permitting scheme. S.Rep. 95-370, *80 (July 28, 1977), reprinted in 1977 U.S.C.C.A.N. 4326, 4405; H.R. Conf. Rep. 95-830, *98 (Dec. 6, 1977), reprinted in 1977 U.S.C.C.A.N. 4424, 4473. While plaintiffs note that in the past the Corps has used the general permitting procedures for categories of activities that are narrowly defined, such as homeowner docks, utility poles or navigation aids, general permits have also been used to authorize dredge and fill activities to support projects

---

[25]This document is not dated but, based on other statements in the document, it was apparently prepared shortly before the Corps issued its public notice for SAJ-86, which occurred on August 29, 2003.

that are more broadly defined, such as oil spill cleanup (NWP 20), recreational facilities (NWP 42), cleanup of hazardous and toxic waste (NWP 38), mining activities (NWP 44), and- - similar to this permit- - residential, commercial and institutional development (NWP 39),[26] and residential and commercial development (SAJ-74).[27] Additionally, while most general permits do provide concrete acreage limits to the amount of dredge and fill activities authorized by these projects, other general permits contain no preset limits.  See, e.g., NWP 38 (authorizing cleanup of hazardous and toxic waste with no preset limits); NWP 21 (authorizing surface coal mining activities with no preset limits)[28]; SAJ-74 (authorizing residential and commercial development

---

[26]Following legal challenges to NWP 39 involving the effect of the permit on the Florida panther (but which did not involve the category of authorized activities), this permit is back before the Corps for reconsideration of its minimal effects finding following additional consultations with the U.S. Fish and Wildlife Service.  Doc. 130 at 9-10.  Notably, the Corps has recently proposed that this permit be modified to remove residential development as an authorized activity, explaining that the Corps "believe[s] that NWP 39 should be modified to authorize only commercial and institutional developments because those types of developments differ from residential developments in a number of ways."  71 Fed. Reg. 56258, 56271 (Sept. 26, 2006).  The Corps is also proposing to modify NWP 29 to include multi-, as well as single-unit residential housing so that all the residential housing activities now authorized by NWP 39 would be covered by NWP 29.  Id. at 56269-70.

[27]Like SAJ-86, SAJ-74 is a regional general permit issued by the Jacksonville District of the South Atlantic Division of the Corps.  SAJ-74 covers residential and commercial development in the Bird Drive and North Trail Basins of Miami-Dade County.

[28]The Corps is now soliciting comments as to whether an acreage limit should be added to NWP 21.  71 Fed. Reg. 56258, 56268.

in Dade County with no preset limits).

Thus, the Court cannot say either by the language of the statute, history or logic that general permits are unalterably reserved for certain narrow types of uses or that SAJ-86 operates in a manner that obliterates any necessary distinctions between individual and general permitting processes.  As long as a permit meets the statutory and regulatory requirements for its issuance (which challenges are addressed below as they relate to SAJ-86), the novelty or scope of a general permit's proposed usage does not alone create grounds for the Court to find it to be outside the law.

The Corps can issue general permits for categories of activities which are similar in nature and whose impacts will have minimal adverse effect on the environment.  As detailed above, in arriving at those determinations, the Corps is required to evaluate the proposed permit in terms of the public interest factors and the 404(b)(1) guidelines, including consideration of alternatives.  That the analysis does not include consideration of alternatives to any <u>specific</u> individual project is a feature contemplated by the entire general permit regulatory scheme- - in other words, full-blown individual project review is precisely the step that Congress intended to avoid under the general permitting scheme.[29]  <u>See</u> S. Rep. 95-370, *74 (July 28, 1977) (summarizing 1977 inclusion of general permits in Clean Water Act amendments as

---

[29]In fact, however, under SAJ-86, which incorporates the EMA, the EMA provides for public notice regarding the DEP's review of each of St. Joe's individual projects. AR 4309-4312.

"a mechanism for eliminating the delays and administrative burdens associated with [the Corps' permitting] program"); Wyoming Outdoor Council v. U.S. Army Corps of Engineers, 351 F.Supp.2d 1232, 1253 (D.Wyo. 2005) ("The Corps believes that the general permit program fulfills Congress' desire to ease the impact of the [individual permit program] upon the public and the Corps by eliminating the delays and administrative burdens associated with unnecessary review of those activities.") (citations and quotations omitted). See also, Ohio Valley Environmental Coalition v. Bulen, 429 F.3d 493, 503 (4th Cir. 2005) (describing the process for obtaining authorization under a general permit as being "significantly more expeditious" than the process for obtaining an individual permit).

The Court therefore rejects plaintiffs' argument that the scope of SAJ-86 renders it unlawful on its face.[30]

---

[30]Because the Court's review is limited to considering whether this permit meets the statutory and regulatory requirements for issuance of a general permit, the Court has no occasion to consider several of plaintiffs' other arguments that grow from its overall position that this permit is an effort to "fit a square peg into a round hole," such as that the Corps was motivated to issue a regional general permit after St. Joe "threatened" to sell its land in piecemeal fashion; that the operation of the individual permit application process within the overlay of the RGP may compromise the rights of individual landowners in the RGP area who may seek individual permits (which landowners would have opportunities to seek review outside the context of this lawsuit); or that the Corps could have achieved a regional wetlands management plan through use of other means, such as a Strategic Area Management Plan, or SAMP (the Court could not locate this program by the citation plaintiffs provided, though the Court did find a *Special* Area Management Plan, or SAMP, described in 16 U.S.C. § 1453(17) for purposes of coastal zone management as "a comprehensive plan providing for natural resource protection and reasonable coastal-dependent economic

**(2)    Does SAJ-86 meet the CWA requirement that a category of authorized activities be "similar in nature"?**

Plaintiffs claim the broad range of activities authorized by SAJ-86 are not "similar in nature," as required for issuance of a CWA general permit.  SAJ-86 "applies to the discharges of dredged or fill material into non-tidal waters of the United States for[:]

> the construction of residential, commercial, recreational and institutional projects, including building foundations, building pads and attendant features that are necessary for the use and maintenance of the structures.  Attendant features may include, but are not limited to, roads, parking lots, garages, yards, utility lines, and stormwater management facilities.  Residential developments include multiple and single unit developments.  Examples of commercial developments include retail stores, light industrial facilities, restaurants, business parks, and shopping centers.  Examples of recreational facilities include playgrounds, playing fields, golf courses, hiking trails, bike paths, horse paths, stables, nature centers, and campgrounds.  Examples of institutional developments include schools, fire stations, government office buildings, judicial buildings, public works buildings, libraries, hospitals, and places of worship."

SAJ-86 (AR 3876-77).  Although the permit itself does not explain how these activities

---

growth . . . ."  St. Joe explained that a SAMP had been a precursor to a regional general permit now used in South Florida but does not provide legal authority for dredge and fill activities under the CWA.  See Doc. 124 at 3.  See also, Corps' Regulatory Guidance Letter, No. 05-09, dated December 7, 2005, located at http://www.usace.army.mil/cw/cecwo/reg/rglsindx.htm (last visited Nov. 6, 2006) (stating goal of Corps' participation in SAMP development should be issuance of "regulatory product," such as a general permit).  Indeed, whether the Corps could have approached this issue differently does not inform the relevant issue of whether the way the Corps decided to proceed was lawful.

are similar in nature, in response to a public comment which challenged the proposed permit on the ground that it failed to conform with this CWA statutory requirement, the Corps stated that these activities are "similar in nature" because they are all components of "suburban development."  AR 3856.

The term "similar in nature" is not defined by the CWA but plaintiffs argue that its meaning is not ambiguous, and the broad range of activities authorized by SAJ-86 could not possibly meet the definition.  Plaintiffs alternatively argue that even if the phrase is ambiguous, the Corps' interpretation should not be accorded <u>Chevron</u> deference because its "interpretation" is not a "formal interpretation" by the agency and therefore should only be upheld if it has the "power to persuade," which plaintiffs claim it does not.  The Corps argues that the meaning of "similar in nature" is ambiguous and that, in the absence of Congressional definition of the term, the Corps' interpretation of the phrase's meaning should be accorded <u>Chevron</u> deference, or, if its regulations do not address it, that its informal interpretation here has the power to persuade.

Few reported cases discuss the meaning of "similar in nature" as used in this statute.  One is <u>Alaska Center for the Environment v. West</u>, 157 F.3d 680 (9th Cir. 1998), in which five general permits were challenged:  one that applied to residential buildings under 50 feet high; one to residential streets no more than 75 feet wide; one to public and private institutions and businesses authorized by a municipal code, with

31

certain exclusions; one to particular industrial developments; and one to specific types of environmental enhancement projects. 157 F.3d at 681, 683.   In determining whether the ranges of activities authorized under each permit were "similar in nature," the court addressed whether the category of activities under the permits was overly broad, such as the residential building general permit which authorized "single[ and] two-family dwellings, row houses, rooming homes and other residential structures." Id. at 683.   The court found the statute did not address whether the Corps was required to issue a general permit only where the category of activities was narrowly defined or whether it could, as the Corps had done in that case, use a general permit to categorize a broader list of activities which would, by virtue of the permit's general and special conditions, result in activities which the Corps found were similar in nature.  Id.  The court therefore looked to the Corps' construction of the statute and found that it made a reasonable determination to rely on permit conditions to ensure that the permit activities would be similar in nature and that  its decision to do so was not arbitrary and capricious.  Id. at 684.

In Wyoming Outdoor, the court looked at the meaning of "similar in nature" in the context of a general permit which authorized dredge and fill activities to support oil and gas production in Wyoming.  351 F.Supp.2d at 1257.  There, the activities authorized by the permit included "surveys, roads, well pads, utilities, reservoirs, erosion control, hazardous waste cleanup, and mitigation." Id. Noting that the statute

did not define "similar in nature" and that there was no formal Corps regulation qualifying for <u>Chevron</u> deference, the court looked to the Corps' interpretation to determine whether it had the power to persuade.  <u>Id.</u> at 1257-59.  In answering this question, the court considered that there were myriad ways in which activities could be categorized (such as by size, type of mineral extracted, physical characteristics, location, or purpose), and that the Corps determination to categorize them based on their purpose (oil and gas exploration) was a reasonable method of differentiating between types of activities and of determining that they were similar in nature.  <u>Id.</u> at 1259.

The Court's "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 340 (1997).  In doing so, the Court assigns words their "ordinary meaning," assuming that "Congress said what it meant and meant what it said."  <u>Wilderness Watch v. Mainella</u>, 375 F.3d 1085, 1092 (11th Cir. 2004) (quotation and citation omitted) (finding that Wilderness Act's prohibition against all but "necessary" motor vehicles could not possibly encompass Park Service's use of fifteen passenger van to ferry tourists across designated wilderness areas).  Ergo, "[c]ommon sense is the most fundamental guide to statutory construction."  <u>Id.</u> at 1093, n.9.

33

As the parties well know, the Court issued a preliminary injunction in this case in part based on its determination that when the term "similar in nature" was applied to the category of activities listed in SAJ-86, common sense dictated that the vast array of activities allowed could not be deemed to be "similar in nature."  The Court therefore found there was no ambiguity in the statute and thus had no occasion to consider according Chevron deference to the Corps' interpretation of the statute. Now, having been aided by the additional briefing and argument by all sides, the Court has taken a fresh, deeper look at this issue.  The Corps is now arguing that the category of activities permitted by SAJ-86 is defined not only by the lengthy list outlined above (which the Court earlier found and still maintains could not possibly be deemed to be similar in nature, especially when the list flatly states that it contains only *examples* of the activities to be permitted, implying that other activities not even mentioned could be authorized by the permit as well), but by the other conditions of the permit, which the Corps argues operate in a manner to give concrete limits to what otherwise might be a limitless list of activities.  For example, while the Court questioned whether the permit activities could just as easily describe "urban development" or "development," the Corps has now explained that by limiting the road and bridge widths to 100 feet, by significantly restricting the amount of land that can be developed in the permit region, and by implementation of the other permit conditions, only "suburban development" activities could comply.

34

When the category of activities in viewed in this light, the Court finds that the term "similar in nature" *is* ambiguous in that it is not clear whether Congress intended the Corps to frame the authorized category through use of permit conditions, as opposed to by just a list of activities, or a combination of both, any of which would be a reasonable interpretation of what Congress may have intended.  The parties and the Court have found no legislative history bearing on this issue.  Therefore, pursuant to <u>Chevron</u>, the Court next turns to the Corps' regulations.  The Corps does rely on a regulation that discusses the "similar in nature" requirement, 33 C.F.R. § 323.2(h):

> (h)  The term *general permit* means a Department of the Army authorization that is issued on a nationwide or regional basis for a category or categories of activities when:
>
> > (1) Those activities are substantially similar in nature and cause only minimal individual and cumulative environmental impacts; or
> >
> > (2) The general permit would result in avoiding unnecessary duplication of regulatory control exercised by another Federal, State, or local agency provided it has been determined that the environmental consequences of the action are individually and cumulatively minimal.

33 C.F.R. § 323.2(h) (internal cross-references omitted).  However, this regulation does not define "similar in nature," it defines the term "general permit."  Moreover, in allowing the Corps to issue a general permit for categories of activities which are "<u>substantially</u> similar in nature" (emphasis added) <u>or</u> when the general permit

35

issuance "would result in avoiding unnecessary duplication of regulatory control," the regulation impermissibly seeks to expand the statutory language and allows the Corps to ignore the statutory requirement that a category of permitted activities be "similar in nature."[31]  Such an interpretation cannot be a permissible construction of the statute and is therefore not due to be afforded <u>Chevron</u> deference.  <u>Johnson</u>, 436 F.3d at 1274.[32]

The Court must therefore consider whether the Corps' finding that the category of activities authorized by SAJ-86 is "similar in nature" should be accorded respect because it has the "power to persuade." <u>Gonzales v. Oregon</u>, 126 S.Ct. at 915; <u>Mead Corp.</u>, 533 U.S. at 234; <u>Skidmore</u>, 323 U.S. at 140.  <u>See also</u>, <u>Wyoming Outdoor</u>, 351 F.Supp.2d at 1258 (describing Corps determination that category of activities were similar in nature as a decision that could not be accorded <u>Chevron</u> deference but that should still be upheld if it had the power to persuade).  In making this determination, the Court considers whether the decision is thorough, logical, based on expertise, consistent with Corps precedent, and any other factor suggesting that the decision is

---

[31]Whether the Corps has nonetheless complied with this regulation, as it must pursuant to <u>Sierra Club v. Martin</u>, 168 F.3d 1, 4 (11th Cir. 1999), is discussed below.

[32]At oral argument, the Corps steered away from reliance on this regulation as grounds to support its similar in nature finding, suggesting the Court instead look to its decision-making and findings in the context of this permit to determine whether they have the power to persuade.  (Tr. 77-82).

persuasive.  Mead, 533 U.S. at 235.[33]

The Corps argues that the category of activities here is similar in nature because they are all components of suburban development and the special and general conditions of the permit ensure that only suburban development activities would meet the permit terms.  The Corps also states that the uniform topography and undeveloped character of the geographic region covered by this permit combined with the limits to the developable area within each sub-basin further ensures that activities

_____

[33]There is Eleventh Circuit authority that arguably supports creation of a mid-level of deference (somewhere between Chevron deference and Skidmore/Mead respect) to be accorded in situations such as where an agency issues an internal guideline (Cook v. Wiley, 208 F.3d 1314 (11th Cir. 2000)) or where an informal adjudication is rendered (Gonzales v. Reno, 215 F.3d 1243 (11th Cir. 2000)).  See also, Movimiento Democracia, Inc. v. Chertoff, 417 F.Supp.2d 1343, 1346-47 (S.D. Fla. 2006) (discussing level of deference to be accorded agency decisions under Chevron, Skidmore, Mead, Cook and Gonzales v. Reno).  However, the Supreme Court's recent decision in Gonzales v. Oregon explains that if an agency decision which interprets a statute does not merit Chevron deference, it "[o]therwise" is "entitled to respect only to the extent it has the power to persuade." Gonzales v. Oregon, 126 S.Ct. at 914-15.  In making that pronouncement, the Court was considering the level of deference to be accorded an Interpretive Rule issued by the Attorney General without consultation of anyone outside the Department of Justice, Id. at 914, and was not, therefore, faced with a situation such as is presented here where the administrative action is not an agency-wide decision based on formal rule-making procedures but has nonetheless been subjected to notice and comment, a feature not present in any case the Court has reviewed (other than Wyoming Outdoor) which accorded an agency decision only Skidmore/Mead respect.  Thus, this could be a case where a mid-level degree of deference such as described in Cook, Gonzales v. Reno, or Movimiento would be appropriate.  However, because the Court finds the Corps' decision that the category of activities of SAJ-86 are similar in nature should be upheld even under Skidmore/Mead review, it need not determine whether a more deferential standard should apply.

associated with other types of development (such as urban development) would not

be authorized by this permit.  The Corps explains that its objective in proposing this

permit was to guide the inevitable suburban growth that was about to take place along

the U.S. Highway 98 corridor in a manner which maximized protection of the

wetlands.  The only mechanism to do this, explains the Corps, is through a general

permit which captures the various types of development activities the potential permit

seekers would likely propose.  The Corps further notes that its finding in this regard

is reasonable because past permits, such as NWP 39 and SAJ-74 had similarly

categorized activities.  Thus, the Corps claims, in this unique circumstance, issuing

a general permit for a range of activities that encompass all the features of suburban

development was a reasonable interpretation of the statute it is charged with

administering.

        In both Alaska Center and Wyoming Outdoor, the courts found that the CWA

permitted the Corps to meet the similar in nature definition of a category of activities

based on more than the labels of the activities themselves. In Wyoming Outdoor, the

court found the Corps interpretation of the statute, which permitted it to take a

divergent group of activities (ranging from roads to reservoirs to utilities to mitigation),

and to consider the purpose of the activities (oil and gas exploration) to find them to

be similar, was "sufficiently persuasive," and therefore the Corps' finding "was not

arbitrary and capricious."   351 F.Supp.2d at 1258-59.   Similarly, in Alaska Center,

the court found that the Corps "made a reasonable determination" and "did not act arbitrarily or capriciously" in relying on general and specific conditions of the permits to satisfy the similar in nature requirement because those conditions "provide[d] further limitations which narrow[ed] application of the permits to a substantial degree," thus ensuring that the result was a category of activities which were similar in nature. 157 F.3d at 683-84.  See also, Ohio Valley Envtl. Coal. v. Bulen, 429 F.3d 493, 498 (4th Cir. 2005) (holding that Corps could define a category of activities by reliance on permit's special conditions).

Here too, the Court is satisfied that the Corps' reliance on the special and general conditions of SAJ-86 sufficiently tailor what otherwise might be a virtually limitless list of activities into a category of activities that are sufficiently similar in nature.  The Corps' decision to issue this permit for these activities was based on four years of discussions and negotiations between the Corps, St. Joe and other federal and state agencies as well as the public over how to manage growth in the area while preserving natural resources.  The Corps envisioned issuing a permit that would capture all of the expected dredge and fill activities that would be necessary to support the expected suburban development in the region.  The Corps narrowed the types of activities that would be authorized by creating special permit conditions that limit road and bridge widths and that restrict areas to be developed by using multiple sub-basins and limiting to a specific percentage the amount of wetlands that can be

dredged or filled.  The Corps considered past permits that had issued for similar categories of activities.   In these circumstances, the Court finds the Corps' determination that the category of activities for this permit is similar in nature, a decision which Congress left for the Secretary to make, is sufficiently persuasive as to be accorded respect.  Mead, 533 U.S. at 235 (findings that are thorough, logical, based on expertise, and consistent with prior interpretations to be accorded respect proportional to their power to persuade).

However, the Court does have some concern that the label (suburban development) that describes the category of activities authorized by SAJ-86 differs from most other past and current general permits the Court has reviewed in that with most other permits, it is obvious from the name of the permit *how* the category of activities permitted *are* similar in nature.  See, e.g., NWP 1 (aids to navigation); NWP 2 (structures in artificial canals); NWP 5 (scientific measurement devices); NWP 11 (temporary recreational structures); NWP 36 (boat ramps); NWP 43 (stormwater management facilities); SAJ-13 (aerial transmission lines in Florida); SAJ-20 (private single-family piers in Florida); SAJ-33 (private multi-family and government piers in Florida); SAJ-34 (commercial piers in Florida); SAJ-77 (residential fill in Jupiter Farms, Palm Beach County); SAJ-78 (residential fill in Palm Beach Estates, Palm Beach County).   With SAJ-86, the only reference by the Corps that this permit is for suburban development comes in a response to a public comment that criticized the

40

Corps for preparing to issue SAJ-86 because it did *not* provide for a category of activities which were similar in nature, to which the Corps responded that the "activities essentially involve the placement of fill material into two pre-identified and evaluated classes of wetlands for the construction of various components that typically comprise suburban development." AR 3856.[34]  The Corps response further explained that NWP 39 authorized nearly identical activities.  AR 3856-57.  These statements are found only in the Memorandum for Record/Statement of Findings, which is not attached to the permit itself, and which in fact is apparently only available to the public upon written request.  See 33 C.F.R. § 325.2(a)(8).  Thus, a potential permit user would not necessarily know that his proposed development activity should fit the category of "suburban development."  However, given the limits that the permit conditions place on the development activities, it appears that only those activities that conform to suburban development would in fact be able to meet the permit terms and secure authorization under SAJ-86.  Additionally, there is no statutory (or regulatory) requirement that the label which ties the authorized activities together be contained on the face of the permit and while it may have been preferable for the

_____

[34]The Court did not comb the entire 4,434 page record to see if there were other references because this reference is the only one cited by the Corps.  However, in both its description of the existing site conditions and its scope of analysis, the Corps noted the presence of "*ongoing suburban development.*"  AR 3802, 3804 (emphasis supplied).  These statements further support the Corps' stated goal of crafting a permit which authorized the types of activities for which the Corps anticipated landowners would seek permits in the SAJ-86 region.

Corps to do so, the Court cannot say it acted in an arbitrary and capricious manner in failing to do so.

The Court is also concerned by what appears to be the Corps' post-hoc adoption of the suburban development label as the term to categorize the activities permitted by SAJ-86.  While the Memorandum for Record certainly pre-dated the permit issuance, a general permit cannot be issued unless the Secretary finds that it is for a category of activities that are similar in nature- - thus, one could anticipate that the Secretary would make a preliminary finding in that regard, references to which would be found in the record well before the public comment period, which post-dated the Corps' August 29, 2003 public notice that it was proposing to issue this general permit.  Again, however, that this might have been handled differently does not make it arbitrary and capricious.[35]

_____

[35]The Court did consider whether the "suburban development" label, or any "label" was necessary at all (a position the Corps seemed to be steering toward at oral argument where it placed much less reliance on this categorization).  Upon reflection, however, the Court finds this label is necessary.  Without the suburban development label to tie them together, SAJ-86 authorizes residential, commercial, institutional, and recreation developments, activities which themselves are not similar in their nature, even with the permit conditions.  No matter how large or small, the Court just cannot fathom how a golf course is "similar in nature" to a dry cleaner or a hospital or a horse stable.  While the Corps has argued that the *impacts* of these activities are similar (which the Court discusses below), the statute authorizes the Secretary to issue general permits for a category of activities only upon finding that the "*activities* in such category are similar in nature," creating separate requirements for the Secretary's findings regarding the *impact* of those activities.  33 U.S.C. § 1344(e)(1) (emphasis added).  The plain language of the statute simply does not permit the similarity of the impacts of the activities to equate to the similar in nature determination.

Satisfied, though barely, that the Corps has met the statutory requirement that SAJ-86 authorize a category of activities that are similar in nature, the Court now turns to the Corps' compliance with a Corps regulation which bears consideration in this regard.

As discussed above, 33 C.F.R. § 323.2(h) permits the Corps to issue a general permit upon finding that the activities to be authorized are "substantially similar in nature" "or" upon finding that the issuance of the permit "would result in avoiding unnecessary duplication of regulatory control exercised by another Federal, State or local agency," provided that in either case, the Corps further determine that the environmental consequences of the action are individually and cumulatively minimal.[36] 33 C.F.R. § 323.2(h)(1) and (2).  Here, the Court has determined not to upset the Corps' determination that the category of activities are similar in nature, but the first part of this regulation speaks of activities being "*substantially* similar" in nature. Whether this is different from "similar in nature" is a matter for debate.[37] 33 C.F.R. §

_____

[36] The "minimal effects" aspect of the Corps' finding is fully discussed below.

[37]It appears the Corps' use of the "substantially similar" terminology pre-dates the statutory appearance of the "similar in nature" language in Congress' 1977 creation of the general permitting program.  See 45 Fed. Reg. 62732, 62735 (Sept. 19, 1980) (describing Congress' 1977 "legislative endorsement" of Corps' criteria for issuance of general permits).   At oral argument, discussion took place as to whether "substantially" similar was a more difficult standard to meet than "similar" alone.  Tr. 77-82.  It could be so argued.  However, another interpretation of "substantially" could be that it is in fact a less onerous test, comparable to its use in the term "substantial compliance," or "substantial performance" where something less than full compliance

43

323.2(h)(1) and (2).  However, because the Corps has met the second part of the regulation ("avoiding unnecessary duplication of regulatory control exercised by another Federal, State or local agency" (33 C.F.R. § 323.2(h)(2)), the Court need not resolve this question.  The Corps determined that the RGP would decrease duplication of effort with the DEP permit program (see, e.g., AR 3857 (describing decreased duplication of efforts with RGP)).  Moreover, the avoidance of issuing multiple permits under the individual permit scheme, which also implicates the work of "other" federal and state agencies, was a motivating factor in the Corps' decision to approach St. Joe about the creation of SAJ-86 in the first place.  Plaintiffs have not argued any contrary position and the Court finds the Corps determination to issue SAJ-86 does not run afoul of this regulation.

The CWA authorizes the Secretary [of the Department of the Army, acting through the Chief of Engineers] to issue general permits "if the Secretary determines that the activities in such category are similar in nature . . ." 33 U.S.C. § 1344(e)(1). Although this is admittedly an extremely close call, the Court finds the Corps has not acted arbitrarily or capriciously, abused its discretion, or acted contrary to law in applying the statute or its implementing regulations to find that the category of

─────────────────────

or performance is deemed acceptable.  See Black's Law Dictionary 1470 (8th ed. 2004) (defining substantial-performance doctrine as rule that a good-faith attempt to perform may be considered complete performance even if all terms not precisely met).  Because the Court finds the Corps has met the second alternative part of this regulation, the Court need not resolve any ambiguity in the first part of this regulation.

activities authorized by SAJ-86 is similar in nature.

**(3)    Does SAJ-86 meet the CWA requirement that a category of authorized activities will cause only minimal adverse environmental effects?**

Plaintiffs further claim that the Corps violated the CWA because the activities authorized by SAJ-86 will cause more than minimal adverse environmental effects. The CWA authorizes the Corps to issue a general permit for activities which "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment."  33 U.S.C. § 1344(e)(1).  SAJ-86 authorizes a wide range of activities and the Corps acknowledges that "[t]he construction and operation of these various developments . . . would have direct, indirect and cumulative impacts on onsite wetlands and waters; but no direct and only minimal indirect impact on aquatic resources outside the [SAJ-86] project area, which include wetlands and receiving waterbodies."  AR 3804.  Indeed, within the RGP area, the permitted activities are anticipated to result in the dredge and fill of up to 1500 acres of wetlands (and possibly more, see AR 3722 (stating wetlands impact under permit may be up to 2037 acres)) and, within that limit, up to 20% destruction of low quality wetlands within any one of the nineteen sub–basins and impacts of up to 125 total acres of high quality wetlands.[38]

---

[38]In June 2006, the United States Supreme Court issued its decision in Rapanos v. United States, an opinion in which the Court discussed the reach of the Corps' jurisdiction under the CWA over "navigable waters" including wetlands.  126 S.Ct.

Neither the CWA nor the Corps regulations define what is meant by "minimal effects" and its meaning is not intuitively obvious in the context of this dispute.  In the Court's preliminary injunction Order, the Court did not address what "minimal effects" meant, but found that the statute required the Corps to make its minimal effects determination *before* the permit issued and that SAJ-86 violated the statute by

_____

2208 (2006).  The Rapanos opinion was obviously not available at the time the Corps developed SAJ-86 or when the parties argued this case at the final hearing before the undersigned.  In supplemental briefs, however, the parties agreed that the Rapanos decision does not affect the basic operation of SAJ-86 or the legal issues presented by this case, but that it could affect the assessment of whether or to what extent impacts to wetlands on any particular project site would require Corps authorization under SAJ-86 (which plaintiffs argue underscores its contention that the Corps has failed to adequately assess the distribution of wetlands in the RGP area in the first place).  Thus, although the *percentage* of wetlands to suffer impact under the permit would not change, the determination of whether land is wetland for purpose of Corps' permitting jurisdiction could vary from what was assumed to be jurisdictional wetland at the time the permit issued.  Although Rapanos, a 4-1-4 decision, did not result in any agreed standard for determining which wetlands fall under the Corps' regulation, it appears that the definition would be less expansive than the current one, not more so.  See Id. at 2224 (plurality opinion describing Corps' expansive view of its jurisdiction which "presse[d] the envelope of constitutional validity"), 2249 (Justice Kennedy criticizing Corps' standard as overbroad and explaining that wetlands must be either adjacent to navigable waters or have a "significant nexus" with navigable waters).  See also, United States v. Johnson, __ F.3d __, 2006 WL 3072145 (1st Cir. Oct. 31, 2006); United States v. Gerke Excavating, Inc., 464 F.3d 723, 724-25 (7th Cir. 2006).  Therefore, the tables and charts calculating the acreage of uplands and wetlands in each sub-basin could be subject to recalculation, with the result being that perhaps fewer acres of "jurisdictional" wetlands will be impacted than is currently contemplated.  However, because the parties have offered no guidance on how different those calculations could be, and because they have not suggested that the Court alter its analysis of the issues in this case based on Rapanos, the Court has assumed for purposes of this decision that the acreage impacts will be as contemplated in the Administrative Record.

permitting the Corps to make its minimal effects determination *after* the permit issued

when an applicant proposed a specific project.   See Doc. 72 at 16-20.   The Court's

analysis rested on two premises:    first, as found by Ohio Valley Environmental

Coalition v. Bulen, 410 F.Supp.2d 450 (S.D. W.Va. 2004), the plain language and

legislative history of the CWA's general permitting scheme prohibited the Corps from

issuing a general permit "predicated on post-issuance review and approval of

particular projects" (Ohio Valley, 410 F.Supp.2d at 467); and second, because the

actual projects to be authorized by SAJ-86 were unknown, and because different

types of projects can have different types of impacts, the Corps could not assess what

the impacts of any projects would be in advance of the permit's issuance.   Thus, the

Court preliminarily found SAJ-86 violated the statutory requirement that a general

permit issue only upon finding that the authorized activities will have only minimal

adverse environmental effects.   Doc. 72 at 19-20.

Now, the Fourth Circuit has vacated that aspect of the Ohio Valley district court

decision upon which this Court heavily relied.   Ohio Valley Envtl. Coal. v. Bulen, 429

F.3d 493 (4th Cir. 2005).   Additionally, with the benefit of further argument and briefing,

and additional study of the entire administrative record (which was only provided to

the Court after it decided the preliminary injunction motions), the Court has given this

issue renewed consideration.

47

Plaintiffs raise three main challenges as to why the Corps' issuance of SAJ-86 fails to meet the CWA's minimal effects requirement, and is therefore arbitrary and capricious, arguing first, that the amount of wetlands SAJ-86 allows to be impacted is *per se* more than minimal; second, the Corps improperly relies on the future implementation of special conditions, particularly mitigation, in making its minimal adverse environmental effects findings; and third, even if the Corps was permitted to rely on special conditions, including mitigation, to make its findings, such findings here lack sufficient scientific support to be sustained.

> (a)   **Does SAJ-86 allow adverse environmental effects which are *per se* more than minimal?**

Plaintiffs claim the Corps acted arbitrarily and capriciously by finding that the adverse environmental effects of SAJ-86 would be minimal because authorizing 1500 or more acres of wetlands to be destroyed by one permit cannot, on its face, be deemed to be a minimal adverse environmental effect, particularly in light of the Executive mandate that the Corps work toward a goal of "no net loss" of wetlands functions and values.  Doc. 30 at 19 (citing December 24, 2002 National Wetlands Mitigation Action Plan, available on EPA website, www.epa.gov/owow/wetlands through link to "mitigation" (last visited Nov. 14, 2006).  As noted above, neither the statute nor the Corps' own regulations define what is meant by "minimal" and, as the meaning of the word in this context is ambiguous, it is therefore appropriate to accord

respect to the Corps' interpretation to the extent that it has the power to persuade.[39]

Gonzales v. Oregon, 126 S.Ct. at 914-15.  In making this determination, the Court

considers whether the Corps' decision is thorough, logical, based on expertise,

consistent with Corps precedent, and any other factor suggesting that the decision is

persuasive.  Mead, 533 U.S. at 235.

Plaintiffs claim the Corps' historical use of specific low per-project wetlands

acreage limits with other general permits reveals that this permit exceeds the "minimal

effects" threshold.  Additionally, plaintiffs explain that because the permit does not

(and could not) prohibit applicants from applying for individual permits, from seeking

project authorizations under other existing nationwide, regional or state permits, or

_____

[39]Neither does the statute define what "environmental" means in the context of
"minimal adverse 'environmental' effects."  The Corps' position is that the statute
refers to the environment affected by the discharge and that in this case, the Corps
has more than met the statute's requirement because it has accounted for the direct
effects to wetlands and other water bodies as well as any indirect or secondary effects
to other aspects of the environment. Tr. 20-22, 103-06.  Plaintiffs have not challenged
this definition for purposes of this case (see Tr. 190-91, 217) and, in light of the Corps'
explanation and its history of addressing only direct effects to wetlands and water
bodies and indirect effects to other environmental features in this context, the Corps'
interpretation is persuasive.  See Ohio Valley, 429 F.3d at 499 (finding Corps
conclusion that activities would not result in significant degradation of "aquatic
environment" met CWA's 404(e) requirement of minimal adverse environmental
effects; Alaska Center, 157 F.3d at 684-85 (finding Corps satisfied general permit's
minimal environmental effects requirement based on wetlands impacts analysis where
wetlands impacts methodology accounted for hydrology, habitat, species occurrence
and social function).  Cf. Wyoming Outdoor, 351 F.Supp.2d at 1254, n. 11 (noting that
"environment" for purposes of 404(e) general permit's "minimal environmental effects"
determination potentially differed from 404(b)(1) guidelines consideration of effect on
"aquatic environment" and finding Corps failed to meet either showing).

from applying for new permits when SAJ-86 expires, the ultimate wetlands impact in

the permit area could end up being higher than what is apparent from the face of the

permit.

However, nothing in the statute compels the Corps to use specific per-project

wetlands acreage limits and the comparison to nationwide permits is not particularly

apt because, as the Corps explained in reissuing all of its NWPs in 2002, providing

low acreage limits for NWPs is one method by which the Corps can ensure minimal

impact because to assess a permit's impacts to wetlands on a nationwide basis "is not

possible or appropriate."  Issuance of Nationwide Permits, 67 Fed. Reg. 2020, 2024

(Jan. 15, 2002).  Such analysis at the District level, however, can be achieved "on a

watershed basis, because they have better understanding of local conditions and

processes."  Id.  Additionally, not all nationwide permits have a per-project acreage

limit, see, NWP 1, NWP 2, NWP 3, NWP 4, NWP 6, NWP 7, NWP 8, NWP 9, NWP

10, NWP 11, NWP 13, NWP 15, NWP 16, NWP 17, NWP 20, NWP 21,[40] NWP 22,

NWP 23, NWP 24, NWP 25, NWP 27, NWP 28, NWP 30, NWP 31, NWP 33, NWP

35, NWP 37, NWP 38, NWP 41, and, just because the per-project limit is low does not

mean that the adverse environmental impact of the entire permit is that low too.  See,

e.g., NWP 39 Decision Document at 25 (available at "Decision Documents for 2002

_____

[40]As noted above, the Corps is currently soliciting comments as to whether an
acreage limit should be added to NWP 21.  71 Fed.Reg. 56258, 56268.

Nationwide Permits" at http://www.usace.army.mil/cw/cecwo/reg/nationwide_

permits.htm) (last visited Nov. 6, 2006) (estimating that permit for residential,

commercial, and institutional developments would be used 7,500 times in five-year

period resulting in loss of 1,250 acres of wetlands); NWP 14 Decision Document at

22 (available at "Decision Documents for 2002 Nationwide Permits" at

http://www.usace.army.mil/cw/cecwo/reg/nationwide_permits.htm) (last visited Nov.

6, 2006) (estimating that permit for linear transportation projects would be used

25,000 times in five-year period resulting in loss of 2,000 acres of wetlands).

As for plaintiffs' contentions about the ways in which landowners might "get

around" the permit to secure authorization to impact additional wetlands, there are

three reasons why this is unlikely to result in any appreciable amount of additional

wetlands impacts.  First, St. Joe, the majority landowner in the region, is required by

the EMA to secure authorization under SAJ-86 for all of its dredge and fill activities

related to the development of residential, commercial, recreational and institutional

projects in the SAJ-86 region.[41]  Second, SAJ-86 would serve as the backdrop against

───────────────

[41]There is, however, record support for plaintiffs' contention that individual and
other general permits might be used in the RGP area.  See, e.g., AR 965 (transcript
of January 29, 2003 technical team meeting at which use of individual permit and/or
overlay of NWP 39 and NWP 42 is raised as method for  landowner to increase SAJ-
86's wetland fill limits allowed for road crossings).  Moreover, as explained at the
hearing, even though St. Joe would have approximately 500 excess credits in its
mitigation banks at the full build-out, which credits it could not use in the RGP area
because the EMA requires it to proceed under the RGP only, those credits could
possibly be used by St. Joe as mitigation credit for projects outside the RGP area or

which the potential impacts of any additional permit requests would be measured; thus, the Corps' evaluation of any additional projects would take into account SAJ-86's watershed management plan and the cumulative impacts anticipated by the projects to be authorized under SAJ-86.  <u>See</u> Tr. 69-73.  Third, because SAJ-86 requires wetlands to be perpetually preserved in conservation easements deeded to either conservation groups or government entities on a 4:1 basis as projects are authorized, the amount of wetlands available for impacts both within and without the framework of the permit will decrease as time goes on until, if and when the full 20% of low quality wetlands and 125 acres of high quality wetlands have been impacted, all additional wetlands will be under conservation and therefore immune from impact. Likewise, even if the permit is modified, revoked, or expires without renewal, wetlands that had been preserved will not be available for development under any other permitting scheme.  For these reasons, the Court finds that the Corps did not act arbitrarily and capriciously in issuing SAJ-86 without any specific per-project wetland acreage limits.

In a related issue, the Corps has also stated that SAJ-86 meets the CWA general permit's minimal adverse environmental effects requirement, even without reliance on the future operation of permit conditions such as mitigation, because the

St. Joe could sell those credits to other landowners not bound by the EMA.

impacts to wetlands will be only 5%.  Although this is not the Corps' primary position,[42]

it does merit the Court's full attention because if SAJ-86 meets the CWA's minimal

adverse environmental effects requirement without reliance on mitigation, the Court

need not reach the issue of whether mitigation *can* be used to achieve the required

minimal effects, one which the parties have presented as one of first impression.

Without considering the mitigation and other post-permit, pre-authorization

requirements, SAJ-86 on its face authorizes projects to result in impacts of up to 20%

of low-quality wetlands and 125 acres of high-quality wetlands.  The permit also

requires St. Joe to set aside 10,084 acres of wetlands and 3,116 acres of uplands in

conservation units.  Thus, within the 40,151 acres of the sub-basins, 22,759 acres of

wetlands and 3,116 acres of uplands would be preserved, and 1,511 acres of

---

[42]Although in its briefs the Corps repeatedly states that it is permitted to consider the "net" effects and argues about why it is permitted to rely on mitigation to reach that determination, at oral argument Corps counsel stated that even without mitigation, the impacts are minimal because only 5% of the wetlands in the area will be impacted. Tr. 110-11.  There does not appear to be any "official" Corps statement in the Administrative Record as to how the permit meets the CWA minimal adverse environmental effects requirement.  The only discussion of those requirements in the Statement of Findings is in a response to a public comment in which the Corps states the CWA requirements are met by this "focused, regionally specific plan to protect the aquatic environment on a watershed scale by authorizing a forward-looking, flexible and predictable permitting program, that would minimize impacts . . . and which would mitigate for direct, indirect, and cumulative impacts within the affected watersheds . . ." AR 3857.  Given the lack of any apparent official position, the Court finds it must address the position advanced at argument that even without mitigation or implementation of other special conditions the permit meets the CWA's minimal effects requirement.

wetlands and 12,764 acres of uplands could be developed.[43]  AR 3845.  The 7,952

acres in the mitigation banks are not included in these computations not only because

this analysis considers the impact of SAJ-86 without mitigation, but also because they

were separately permitted (and the Devil's Swamp mitigation bank is not even within

the physical boundaries of the RGP area), although their acreage is added to the sub-

basin acreage to arrive at the 48,150 acre figure generally used to describe the RGP

area.  See AR 3801, 3845.  On its face, therefore, and without accounting for post-

permit mitigation or other special conditions, SAJ-86 allows impacts to 6.6%[44] of the

_____

[43]As noted above, some of these figures are subject to change if any of the RGP-area wetlands are no longer subject to Corps' jurisdiction pursuant to the less expansive definition of wetlands under Rapanos, 126 S.Ct. 2208.

[44]The Corps' 5% figure is achieved by including the wetlands in the mitigation banks which, as explained above, are not appropriately included in this particular analysis.  Plaintiffs further explain that the 5% figure is deceptive because it implies that 95% of wetlands which could otherwise be impacted by development are being saved. In fact, plaintiffs say, the 95% of "saved" wetlands would not all be conducive to development, a point seemingly supported in part by the Corps' wetlands table, which includes 588.79 acres of water in the wetlands acreage figures.  AR 3845, n.1 to chart.  St. Joe explains that these "waters" are flowing creeks and streams running through wetlands which could be impacted using a Corps permit, but that in fact very little of these waters will be impacted by development activities under SAJ-86 because they are (with a minor ½ acre exception) among the 7,253.15 high-quality wetlands in the sub-basins, impacts to which are limited by the permit's 125 total acre high quality wetlands impact limit and by Special Condition 5(c)'s prohibition of impairments to hydrologic conveyance.  Doc. 131 at 9-10, AR 3877-78.  Thus, regardless of whether these creeks and streams would in fact be developable, because they fall into the "high quality wetlands" category (see chart entry on AR 3844-45 for "waterbodies"), they are not implicated in the permit's 4:1 preservation strategy for low-quality wetlands and therefore do not create a basis to question whether wetlands are genuinely being "saved" under that strategy.  Plaintiffs have not

wetlands that will be within the permitting sub-basins.

The question, then, is whether the Corps is correct that this is a minimal adverse environmental effect within the meaning of the CWA.  The Court finds that it is not and here is why:  As stated earlier, nearly all development activities within the RGP area require a Corps permit because the wetlands are interspersed among the uplands.  As explained by the Corps, the "configuration of wetlands and other waters . . . make the [RGP] area *virtually undevelopable* without some degree of [Corps] regulat[ion]."  AR 3804 (emphasis added).  Thus, although a Corps permit is not generally required before a landowner can develop uplands, in this instance, the effect of allowing impacts to 6.6% of the wetlands will be that 12,764 acres of previously undevelopable uplands can be developed (AR 3845)[45] resulting in the potential for permitted development to now cover 35.6% of the property within the nineteen sub-basins.  As the Corps itself recognized, the development contemplated by SAJ-86, "whether located in wetlands . . . or on uplands, would have direct, indirect and cumulative impacts on onsite wetlands and waters."  AR 3804.  Thus, the direct

_____

offered any other particular basis upon which to question the developability of any wetlands in the RGP area (other than their overall contention, further discussed below, that the Corps' failure to sufficiently delineate the wetlands precludes any true analysis of wetlands and impacts to them under the permit).

[45]The construction of the WaterSound North development components which are proceeding in the face of the preliminary injunction is an apparent exception to this general statement.

effect on wetlands and water bodies and the indirect effect on other features of the environment as a result of the construction activities authorized by SAJ-86 over an otherwise "virtually undevelopable" (AR 3804) "very complex mosaic of uplands and wetlands" (AR 3804) is that 35.6% of the region may now be developed, a result which could hardly be deemed to be a "minimal adverse environmental effect" within the meaning of the CWA under any possible construction of the statute.[46]  See also, Wyoming Outdoor, 351 F.Supp.2d at 1242 (explaining in context of NEPA claim that Corps' cumulative impact analysis must include projects likely to result from issuance of permit and that Corps is therefore "obligated to assess cumulative impacts relating to projects in which the use of [the permit] is essential to [their] completion").  The Court therefore finds that, pretermitting reliance on mitigation and future compliance with special conditions, SAJ-86 does not meet the CWA's requirement that a general permit issue only for activities whose adverse environmental effects are both individually and cumulatively minimal.  Thus, the next question is whether the Corps acted lawfully under the CWA in relying on post-permit conditions to assess SAJ-86's adverse environmental effects and, if so, whether the conditions upon which it relied support its determination that SAJ-86's adverse environmental effects are minimal, both separately and cumulatively.

─────────────────────

[46]When pressed at oral argument, counsel for the Corps argued that perhaps an impact as high as 10% would still be minimal.  Tr. 103.

**(b)    Did the Corps violate the CWA or act arbitrarily and capriciously in relying on post-permit conditions, particularly those regarding mitigation, to make its minimal adverse environmental effects determinations for SAJ-86?[47]**

In issuing the preliminary injunction Order, the Court adopted the reasoning of the district court opinion in <u>Ohio Valley</u> and held that the Corps could not issue a general permit "predicated on post-issuance review and approval of particular projects" which, in essence, would permit the Corps to defer its minimal effects determination until after the permit issued.  <u>See</u> Doc. 72 at 18, <u>citing</u> <u>Ohio Valley</u>, 2004 WL 1576726, at *14-15 (now published at 410 F.Supp.2d 450, 467).   In the general permit at issue in <u>Ohio Valley</u> (NWP 21), the Corps authorized the discharge of coal mining waste but required that a project sponsor first receive a written determination from the Corps that the activities would result in only minimal adverse

---

[47]The Corps contends plaintiffs waived this argument by failing to raise it before the permit's issuance during the public notice and comment periods. Doc. 103, at 10, n.4. Sierra Club responded to the proposed RGP by stating, <u>inter alia</u>, that it should be withdrawn, that the public should be involved in the individual project approval process, that wetlands impacts should be further minimized, and that the permit failed to protect wetlands to the same degree as individual permits. AR 3811.  Together, these statements (and statements raised by other public commentators, <u>see, e.g.</u>, AR 3811, comments from Clean Water Network that proposed RGP fails to meet minimal effects showing under CWA), sufficiently trigger all arguments that the Corps failed to satisfy the minimal effects findings required by the CWA.  It does not appear that the Natural Resources Defense Council received public notice or submitted comments.  <u>See</u> AR 1855-81 (public notice mailing list); <u>see also</u> AR 3870 (Corps statement that it sent RGP file documents to counsel for NRDC on April 2, 2004 in response to March 4, 2004 FOIA request and was then in process of assembling other materials).

environmental effects, both separately and cumulatively. <u>Ohio Valley</u>, 410 F.Supp.2d at 455. The district court found that the CWA prohibited the post-permit case-by-case evaluation of adverse environmental effects contemplated by NWP 21 and found the Corps acted arbitrarily and capriciously by deferring this determination until after the permit issued. <u>Id.</u> at 467. That aspect of the <u>Ohio Valley</u> opinion has now been vacated by the Fourth Circuit which found the district court read the CWA too narrowly in requiring the Corps to make all of its minimal effects determinations in advance of issuing the permit. 429 F.3d at 500. In reaching this decision, the Fourth Circuit stated that nothing in the language of the CWA dictated "how the Corps must make the minimal-impact determinations, the degree of certainty that must undergird them, or the extent to which the Corps may rely on post-issuance procedures in making them." <u>Id.</u> Thus, the Fourth Circuit held that the CWA did not forbid the Corps from relying in part on post-permit procedures to make its pre-permit determinations that the adverse environmental effects would be minimal. <u>Id.</u> at 500-01.

The Corps argues that like the NWP 21 permitting scheme approved by the Fourth Circuit, here too, the Corps made a reasoned prediction that the environmental effects of SAJ-86 would be minimal and, once a project sponsor seeks authorization for a particular project, the Corps makes the second phase of its determination, ensuring that the adverse environmental impacts will indeed be minimal. Although the

Court does consider the Fourth Circuit's opinion to be persuasive,[48] for several reasons, that opinion does not necessarily control the outcome here.

First, as explained in the preliminary injunction Order, this Court's preliminary decision that the Corps' minimal effects determination was deficient here was based on the Court's other preliminary finding that SAJ-86 did not adequately define the activities that were authorized by the permit (which was not an issue in Ohio Valley where NWP 21 authorized surface coal mining activities), thus preventing the Corps from determining what the environmental effects would be in the first place.  The Court adopted the district court's Ohio Valley analysis to support its preliminary holding that the CWA's general permitting scheme would not permit the Corps to wait until after the permit issued when projects were first proposed to address whether the environmental effects of those heretofore unknown projects would be minimal. Having now concluded that in this case the Corps has sufficiently crafted a category of activities that are similar in nature, the Court's earlier decision that the effects of those activities are unknown must be revisited and the Fourth Circuit's holding that the Corps can use predictions of post-permit conditions to inform the minimal effects determinations must be a part of that consideration.

Second, although with both NWP 21 and SAJ-86, the Corps relies at least in part on the future enforcement of special conditions to make its minimal effects

---

[48]There is no Eleventh Circuit precedent on this issue.

determination, what is unique here is that the Court is required to specifically address the Corps' reliance on mitigation to determine whether the adverse environmental effects of activities authorized by SAJ-86 will be minimal.  The Fourth Circuit held that the CWA did not prevent the Corps from relying on post-permit considerations to make its minimal effects determinations, but remanded the case to the district court to determine in the first instance whether such findings in the issuance of NWP 21 were arbitrary and capricious.  429 F.3d at 503 n.6.  Thus, the Fourth Circuit did not address the issue of whether the Corps' reliance on any particular post-permit consideration, including mitigation, was arbitrary and capricious.[49]

Third, although NWP 21 and SAJ-86 are both types of general permits, unlike NWP 21, SAJ-86 is a regional general permit and, because a different set of regulations apply to regional general permits, the Court must examine the Corps' compliance with those regulations.  Additionally, the parties have raised regulations not addressed by the Ohio Valley district court or Fourth Circuit opinions which must be considered as they apply to SAJ-86.

---

[49]Mitigation was one of the post-permit considerations upon which the Corps intended to rely and the Corps has reported that on remand to the Ohio Valley district court, plaintiffs have challenged that reliance and have renewed various other objections to the issuance of NWP 21.  According to the Corps, those matters are now fully briefed and awaiting decision by the district court.

Each of these issues is addressed in the following discussion.

The Corps has explained that its history of experience with permitting in the Florida panhandle has shown that the low quality wetlands in the geographic region covered by SAJ-86 are largely uniform due both to their flat topography and sandy soil as well as from the effects of decades of silviculture industry activities on St. Joe's lands.  See AR 3801, 3804, 3818, 3841-42, 3863; Tr. 223-24.  Thus, unlike a nationwide permit where it could be virtually impossible for the Corps to make any predictions as to environmental effects (which is why the Corps often relies in those circumstances on low per-project acreage limits, see 67 Fed. Reg. at 2024), here the Corps has studied the region where the activities will take place and is able to predict the environmental effects of those activities on wetlands in a much more concrete way.  However, even if the Corps is able to predict that the adverse environmental effects to wetlands will be uniform, this does not address whether such effects will be minimal and further does not address the effects on other aquatic bodies.  It is these determinations which the Corps claims are satisfied by its reliance on the future implementation of the special conditions of the permit.

The Corps claims that the minimal adverse environmental effects determinations required under the CWA for issuance of a general permit are satisfied

61

by the implementation of the following special conditions of SAJ-86:[50]

- Special Conditions 1 and 2 require that projects include specific stormwater treatment plans that set higher standards for stormwater discharge than the state's current stormwater treatment requirements for the region. The Corps explains that these plans will minimize the stormwater runoff occurring due to the filling of wetlands that would otherwise naturally absorb stormwater. AR 3818.

- Special Condition 1 adopts all the conditions of the EMA as special conditions of SAJ-86 for projects occurring in the EMA area. The EMA has its own water quality certification standards and stormwater treatment measures that the Corps says are also more stringent than current state requirements. The Corps also explains that through incorporation of the EMA, the Corps is able to place additional restrictions on developments by St. Joe, the majority landowner in the permit region, such as requiring that it not seek project authorization outside the RGP process for projects of a type that SAJ-86 authorizes.

- Special Condition 9 requires that only clean fill and rock material be used for wetland fills, which the Corps explains will minimize the effect of any erosion of fill materials which in turn minimizes the effect on the circulation, fluctuation, and salinity of receiving waterbodies and further ensures that suspended particulates from authorized activities will be unlikely to affect the turbidity of receiving waters or wetlands. AR 3817-19.

---

[50]In addition to the Special Conditions, the Corps states that by complying with the 404(b)(1) guidelines, by addressing the public interest review factors, and by reaching a FONSI determination under NEPA, the Corps demonstrates that the permit will have minimal adverse environmental impacts, minimal cumulative and secondary impacts, and minimal impact to federally threatened or endangered species, and essential fish habitat. AR 3817-26; 3839-55; 3870. However, because the Corps' satisfaction of each of these criteria is contingent on the permit's special conditions, the Court has confined its analysis here to the special conditions themselves as well as any particular factor the Corps points to as support, without regard to which "type" of factor it is (meaning without regard to whether it is a factor the Corps is required to address pursuant to the 404(b)(1) guidelines, NEPA or the public interest considerations). Plaintiffs' specific challenges to the Corps' compliance with the 404(b)(1) guidelines, the public interest factors and NEPA are addressed below.

- Special Condition 7 requires 30 - 100 foot buffers between all development and Lake Powell.  These buffers are to be preserved and maintained in an essentially natural condition without the use of fertilizers, herbicides or pesticides in the buffers, which the Corps explains will serve to protect the lake's water quality.

- Special Condition 11 (b) establishes that the first priority for mitigation outside the Lake Powell basin is in the Devil's Swamp and Breakfast Point mitigation banks, which the Corps explains are located in ecologically significant areas comprised of approximately 7,700 acres that will now be protected from development.  AR 3200-01, 3345-46, 3845-46.  Additionally, the Breakfast Point mitigation bank is designed to buffer a 2,500 acre parcel of high quality conservation land lining the shore of West Bay (the Breakfast Point Peninsula conservation unit), thus providing protection to eleven miles of shoreline.  AR 3200-01.

- Special Conditions 4 and 5 define the high and low quality wetlands and explain the criteria for wetlands impacts ensuring, the Corps states, that 90% of the wetlands impacts will be in areas already highly impacted by silviculture activities and encouraging the clustering of preservation by maintaining the 20% impact limit on a sub-basin wide basis.  AR 3840.

- Special Condition 8 requires buffering for high quality wetlands by low quality wetlands or uplands that must be preserved and maintained in an essentially natural condition, without the use of fertilizers, herbicides or pesticides.

- Special Condition 10 prohibits any wetland fill from severing an existing jurisdictional connection or from isolating a jurisdictional area, thus minimizing impact to wetlands and their dependent environmental resources.

- Special Condition 14 establishes the ten conservation units, which, like the mitigation banks, are strategically located in ecologically sensitive areas that will now be protected from development.  AR 3806-07.

- Special Condition 20 sets forth the individual project approval procedures which include a pre-application meeting to which representatives of the Corps, DEP, EPA, U.S. Fish and Wildlife Services, National Marine Fisheries Services, and Northwest Florida Management District are invited to evaluate whether a proposed project meets the requirements and criteria of SAJ-86 and "to discuss the proposed project design and the opportunity for habitat corridors between

on-site wetlands, the [c]onservation [u]nits, and other wetlands in the RGP area." AR 3885. For the pre-application meeting, the project sponsor is required to produce a description of the scope of the proposed project, its specific location and boundaries, an identification, delineation and mapping of all wetlands in the project area, a description of proposed wetlands impacts and compliance with the RGP, engineer certifications of stormwater treatment plans, documentation of coordination with the State Historic Preservation Officer and compliance with any archeological or historical surveys required by that agency, documentation of site evaluation for the presence of flatwoods salamanders, bald eagles, and telephus spurge (which the Corps' Biological Assessment has identified as threatened or endangered species in the RGP area (see AR 3853-54)) and, where appropriate, evidence of compliance with guidelines for the preservation of these species. AR 3885-86.

- Finally, Special Condition 21 allows the Corps, on a case-by case basis, to "impose special conditions that are deemed necessary to minimize adverse environmental effects" (AR 3886), which the Corps explains will give it leverage to see that wetlands impacts are managed in the manner envisioned by the permit's framework, without having to predetermine the precise effects to each acre of land in the permit region.

Thus, according to the Corps, the design of SAJ-86, through the implementation of the permit's special conditions, allows for the creation of the two mitigation banks, the ten conservation units, and individual project site wetlands preservation that will comprise an enhanced network of wildlife corridors and significant wetland and upland habitats, linking ecological resources from Choctawhatchee Bay to West Bay and ensuring minimal impact. AR 3820. This will be a wildlife corridor linking the most highly prized ecological resources in the area, which could only be accomplished through the implementation of the special conditions of this permit. Additionally, the mitigation in the conservation units will transform the land use from the existing extensive silviculture (which could continue

unabated as exempted activity) to a public resource creating a wildlife corridor and habitat.  Moreover, notwithstanding the fill of approximately 1500 acres of wetlands in the area, the Corps explains that the mitigation in the silvicultured wetlands will actually result in a net increase in terms of wetland functions within the SAJ-86 region. The Corps states that SAJ-86's permitting scheme allows the Corps to control impacts throughout the landscape on a watershed basis and to cluster areas of development and impacts away from clustered areas of restoration, enhancement and preservation needed to form wildlife corridors and habitats, which ensures lesser individual and cumulative impacts than could be achieved through the individual permitting process. AR 3806, 3816, 3855.  Moreover, the Corps states that the landscape scale of the development plan allows for improved cumulative impacts assessment over individual permitting (AR 3820, 3855), thus ensuring minimal impact.  Additionally, the stormwater treatment plans, along with mitigation, conservation, and on-site preservation ensure that the secondary effects (including changes in water circulation and flow patterns, changes in stormwater runoff volumes and quality, release of leachate from septic tanks, and reduction in habitat size and/or connectivity for species that are dependent on or use the aquatic environment) are minimal (AR 3820-21, 3855).

Assuming that the Corps is permitted to rely on the future implementation of a general permit's special conditions, including mitigation, to reach its minimal effects

determination under the CWA and further assuming that the Corps' reliance here on the special conditions of SAJ-86 is warranted, the Court finds that the Corps' determination that the adverse environmental effects of the activities authorized by SAJ-86 are both individually and cumulatively minimal is not arbitrary and capricious because the special conditions sufficiently ameliorate what the Court has determined would otherwise be more than minimal adverse environmental effects from the activities authorized by this permit.[51]

Plaintiffs, however, argue that the CWA does not allow the Corps to rely on special conditions to make its minimal effects determinations in the context of a general permit and that, even if it did, the Corps' reliance on special conditions here is arbitrary and capricious because there is insufficient scientific support for the Corps' mitigation strategy, water quality analysis and stormwater treatment management plans, and the permit's authorization procedures fail to provide adequate assurance that the permit will be implemented as intended.

The Corps claims that because the CWA does not define the phrase "minimal adverse environmental effects," it is permissible for the Corps to interpret that phrase

---

[51]In arriving at this conclusion, the Court has considered the entirety of the evidence cited by the Corps as support for its CWA minimal effects determinations. While recognizing that the Corps also considers most of this evidence as part of its evaluation of the 404(b)(1) Guidelines, its public interest review and its FONSI determination under NEPA, the Court has not had occasion to consider the question of whether satisfying any one of these particular criteria would alone be sufficient to meet the CWA minimal effects determination.

to mean the "net effects" which, here, would mean the Corps will consider whether SAJ-86 results in minimal adverse environmental effects after accounting for the implementation of all of its special conditions, including mitigation. The Court must accord the Corps' interpretation deference to the extent it has the power to persuade. Mead, 533 U.S. at 228, Wyoming Outdoor, 351 F.Supp.2d at 1257-58.

Although the Corps has not issued any regulations defining minimal adverse environmental effects[52] or explaining how that phrase should be interpreted in the context of a regional general permit, the Corps has maintained that special conditions including compensatory mitigation can be considered to ensure that the adverse environmental effects of permitted activity will be minimal for purposes of the CWA. For example, in reissuing its NWPs in 2002, the Corps explained that "[t]he regional conditioning process . . . helps ensure that the NWPs authorize activities with no more than minimal adverse effects on the aquatic environment, individually and cumulatively." 67 Fed. Reg. at 2024-25. In that same notice, the Corps also stated that the "terms and conditions" of NWPs "ensure that the activities authorized by

---

[52]In fact, in reissuing all NWPs in 2002, the Corps specifically declined to issue a minimal adverse environmental effects definition by regulation. 67 Fed. Reg. at 2075 (responding to public comments that the Corps should issue a definition by explaining that the criterion for evaluating whether adverse environmental effects are minimal is best left to district engineers who are familiar with site specific factors that account for the variety of aquatic resources and functions). The Corps has not suggested any definition of the phrase in its proposed modifications to the NWP program. 71 Fed. Reg. 56258, 56280-81 (Sept. 26, 2006).

NWPs result in no more than minimal adverse effects on the aquatic environment, including wetlands and streams."  Id. at 2021 (citing both general and special conditions as examples).   Thus, the Corps has demonstrated a history with nationwide permits, which are a species of general permit, of relying on special conditions to ensure minimal effects and, as noted above, several NWPs specifically require mitigation (NWP 14, 21, 39, 40, 42, 43).

Additionally, the EPA's 404(b)(1) guidelines, which the CWA requires the Corps to apply in issuing both individual and general permits (33 U.S.C. § 1344(b)), provide for the consideration of environmental benefits (i.e., mitigation measures) to minimize environmental effects of proposed activities.  44 C.F.R. § 230.77(d).  The Corps also considers mitigation in determining whether the adverse environmental effects of activities authorized by a permit can be reduced.   33 C.F.R. § 325.4(a)(3); 320.4(r)(1).[53]

---

[53]Moreover, NEPA, which admittedly requires the Corps to consider both the detriments and benefits of proposed actions, allows the Corps to consider mitigation in assessing whether an individual or general permit will have a "significant" environmental impact and the concept of a "mitigated FONSI," which is a finding of no significant impact *after* consideration of mitigation, is supported under the law. See, e.g., Spiller v. White, 352 F.3d 235, 241 (5th Cir. 2003), cert. denied, 125 S.Ct. 34 (2004); P.E.A.C.H. v. U.S. Army Corps of Eng'rs, 87 F.3d 1242, 1248-49 (11th Cir. 1996) (upholding Corps determination that individual permit for a highway would not result in significant impact because permit mandated mitigation for impacts to wetlands and historic district).

Plaintiffs argue that what is distinguishable between those situations and the Corps' efforts here is that while the Corps often relies on mitigation as a method to ensure that an earlier pre-permit determination of minimal adverse environmental effects is properly effectuated, in this case, the Corps is relying on mitigation and the implementation of other special conditions to actually meet the minimal effects determination necessary to issue a general permit in the first place.  Plaintiffs state that the plain language of the CWA and its two distinct permitting schemes (individual and general) requires the Corps to make its minimal effects determination before a general permit issues, without relying on the implementation of special conditions such as mitigation.

Plaintiffs are not alone in their position.  In dissenting from the denial of rehearing en banc in the Fourth Circuit's <u>Ohio Valley</u> decision, Judge King, joined by Judges Michael and Motz, authored an opinion stating that the panel's approval of the procedure used by the Corps in NWP 21 contravenes the CWA statutory requirements which compel the Corps to issue an individual permit unless it can "make the required determination of minimal environmental impact <u>before</u> it issue[s] [a] general permit."  <u>Ohio Valley Envtl. Coal. v. Bulen</u>, 437 F.3d 421, 423 (4th Cir. 2006) (King, J., dissenting from denial of reh'g en banc) (emphasis in original).  While agreeing with the panel that the Corps could make "post-issuance <u>evaluations</u>" to ensure compliance with a minimal effects determination, Judge King found the Corps

went too far with NWP 21 because it failed to make the "pre-issuance <u>determination</u>" required to issue a general permit, even responding to public concerns regarding potential impacts by stating that those "'issues will be evaluated during the case specific minimal effects determination' provided for in the post-issuance procedure." <u>Id.</u> (citing 67 Fed. Reg. at 2041) (emphasis added).[54]   Thus, the dissent found the Corps' issuance of NWP 21 violated the "strict procedural requirements" of the general permitting scheme created by Congress to protect the environment.  <u>Id.</u> at 424.

However, the procedures of SAJ-86 are distinguishable from those in NWP 21 in two respects.   First, unlike NWP 21, the only true deferral here is of the determination of the specific location of projects and their resulting impacts within each sub-basin.  The Corps already knows what the overall limits of the impacts will be within the entire RGP area and within each of the nineteen sub-basins.  The Corps has also pre-determined through the permit's special conditions how these impacts will be managed to achieve the permit's goal of guiding growth in a manner that

---

[54]NWP 21 authorizes discharge of dredge and fill materials to support coal-mining operations "provided the coal mining activities are authorized by [particular state or federal agencies] and provided the permittee notifies the District Engineer in accordance with the 'Notification' General Condition."   67 Fed. Reg. at 2081. Additionally, "the District Engineer must determine that the activity complies with the terms and conditions of the NWP and that the adverse environmental effects are minimal both individually and cumulatively and must notify the project sponsor of this determination in writing."  <u>Id.</u>

maximizes protection of wetlands on a landscape basis, while ensuring that the adverse environmental effects of the authorized activities are minimal.  Second, the Ohio Valley dissent did not address the specific issue presented by this case of whether the Corps may consider mitigation to arrive at a determination of "net" effects to satisfy the CWA's minimal adverse environmental effects requirement.

Moreover, the Fourth Circuit panel decision (which was upheld by the denial of rehearing en banc, 437 F.3d 421 (4th Cir. 2006)) vacated the Ohio Valley district court holding that the Corps violated the CWA by relying on post-permit procedures to make its minimal effects determinations in issuing a general permit. 429 F.3d at 505. The Fourth Circuit held that the CWA was "silent on the question whether the Corps may make its pre-issuance minimal impact determinations by relying in part on the fact that its post-issuance procedures will ensure that the authorized projects will have only minimal impacts." Id. at 501.   Therefore, the Court deferred to the Corps' conclusion that it could do so.  Id.

Similarly, in Alaska Center, the Ninth Circuit addressed an environmental group's challenge that the Corps violated the CWA's minimal environmental effects requirement by issuing five general permits for construction projects in Anchorage which collectively allowed potential impacts to over 2,000 acres of wetlands. 157 F.3d at 681-82.   In rejecting that challenge, the Ninth Circuit found the Corps satisfied the requirement that the activities authorized would have minimal effect on the

71

environment when it properly relied on the permit's general and special conditions which provided "buffer zones to protect adjacent wetlands and waterbodies of higher environmental value; limits on the type of discharge materials; [ ] a requirement that the applicant receive an initial opinion of compliance from the municipality"; restrictions on road widths and building heights; and prohibitions against certain pollutants; "which narrow[ed the] application of the permits to a substantial degree." Id. at 683.  Thus, the Ninth Circuit found that the general and special conditions of the permits "satisf[ied] th[e] requirement" that the activities result in "similar minimal effect on the environment."  Id.

While neither Alaska Center nor Ohio Valley addressed whether the Corps could rely on mitigation, both stand as precedent for the finding that the Corps can rely on a general permit's special conditions to reach its pre-permit minimal effects determinations under the CWA.[55]   The Corps' position on mitigation is further

_____

[55]The Corps also relies on Abenaki Nation of Mississquoi v. Hughes, 805 F.Supp. 234 (D. Vt. 1992), to support its position.  However, the relevant challenge there was whether the Corps properly issued a specific project authorization for a village generating plant under an existing permit authorizing hydroelectric development projects in New England.  Id. at 239.  Although the terms of the authorization required the village to comply with a complex and detailed mitigation plan to compensate for any loss of wetlands' function and value before proceeding so that the project could remain below the CWA's general permit minimum effects threshold, the terms of the general permit itself prohibited all impacts to wetlands.  Id. at 239, 244 n.14, 249.  The court therefore found that if the project resulted in any wetland fill (a result the court deemed speculative), the authorization for the project could be revoked.  Id. at 249. Thus, while this case serves as an example of how the Corps can tailor the conditions of a specific authorization to remain within the requirements of the CWA, it does not

72

supported by its October 15, 1999 standard operating procedures (AR 170-199),

which were distributed to the technical team working on SAJ-86 at a August 2001

meeting, and which explain that general permits, "includ[ing] [both] nationwide permits

[ ] and regional general permits," "should be used rather than [individual] permit[s]"

"[f]or projects that involve minimal net adverse environmental effects on the aquatic

environment, after consideration of compensatory mitigation." AR 176 (emphasis

added). These procedures explain that "[t]he use of GPs [general permits] are

encouraged, because GPs can be conditioned sufficiently to provide the same

environmental protection as an [individual permit] . . . including conditions addressing

. . . compensatory mitigation . . . and are just as enforceable." AR 176. See Mead,

533 U.S. at 235 (stating that agency decision's "fit with prior interpretations" is a factor

in assessing persuasive value to be accorded such decision).

Additionally, the Corps' regulation defining mitigation explains the importance

of mitigation in the Corps' permitting scheme and states that it is to be used in cases

of "significant resource losses." 33 C.F.R. § 320.4(r)(2).[56] Several nationwide permits

―――――――――――――

speak to the issue of whether the Corps can rely on special conditions including
mitigation to reach a minimal effects determination in issuing a general permit.

[56]The relevant text of the regulation (which includes a footnote) states:
   [33 C.F.R.] § 320.4 General policies for evaluating permit applications.
         The following policies shall be applicable to the review of all applications
   for D[epartment of] A[rmy] permits. Additional policies specifically applicable
   to certain types of activities are identified in 33 CFR parts 321 through 324.
                              . . . .

require compensatory mitigation (<u>see</u> NWPs 14, 21, 39, 40, 42, 43) and in those

_____

> (r) Mitigation.[1] (1) Mitigation is an important aspect of the review and balancing process on many Department of the Army permit applications. Consideration of mitigation will occur throughout the permit application review process and includes avoiding, minimizing, rectifying, reducing, or compensating for resource losses. Losses will be avoided to the extent practicable. Compensation may occur on-site or at an off-site location. Mitigation requirements generally fall into three categories.
> ( i) [description then follows of project modification],
> (ii) Further mitigation measures may be required to satisfy legal requirements. For section 404 applications, mitigation shall be required to ensure that the project complies with the 404(b)(1) Guidelines. Some mitigation measures are enumerated at 40 CFR 230.70 through 40 CFR 230.77 (Subpart H of the 404(b)(1) Guidelines).
> (iii) [description then follows of public interest review]
> . . . .
>
> (2) All compensatory mitigation will be for significant resource losses which are specifically identifiable, reasonably likely to occur, and of importance to the human or aquatic environment. Also, all mitigation will be directly related to the impacts of the proposal, appropriate to the scope and degree of those impacts, and reasonably enforceable. District engineers will require all forms of mitigation, including compensatory mitigation, only as provided in paragraphs (r)(1)(i) through (iii) of this section. Additional mitigation may be added at the applicants' request.
>
> [1] This is a general statement of mitigation policy which applies to all Corps of Engineers regulatory authorities covered by these regulations (33 CFR parts 320-330). It is not a substitute for the mitigation requirements necessary to ensure that a permit action under section 404 of the Clean Water Act complies with the section 404(b)(1) Guidelines. There is currently an interagency Working Group formed to develop guidance on implementing mitigation requirements of the Guidelines.

instances the Corps must therefore have anticipated that without the compensatory

mitigation, "significant resources losses" (which common sense dictates must be at

least something more than a "minimal adverse environmental effect") would have

occurred.[57]  Like regional general permits, nationwide permits are a species of general

permit, and these NWPs are therefore convincing evidence that the Corps has

previously relied on mitigation to reach its minimal effects determination in the context

of a general permit.

For these reasons, the Court determines to follow the lead of the Fourth Circuit

in Ohio Valley and hold that the Corps did not violate the CWA in utilizing "post-

issuance" (post-permit) conditions, including mitigation, to make its "pre-issuance"

(pre-permit) "minimal adverse environmental effects" determination for SAJ-86.[58]

The next question is whether the structure of SAJ-86 violates any of the Corps'

own regulations.  33 C.F.R. § 325.4, which addresses "Conditioning of Permits," lists

the legal requirements that may be met by the inclusion of permit conditions and the

---

[57]By this same logic, this regulation also supports the Court's finding above that without consideration of mitigation, the adverse environmental effects of activities authorized by SAJ-86 would not be minimal.

[58]While not relying on this fact to reach decision here, as a regional general permit, SAJ-86 will expire five years after its issuance (on June 30, 2009).  33 C.F.R. § 325.2(e)(2).  At that time, the Corps states that it will reevaluate the permit "following the same procedures that pertain to the issuance of a general permit under the [CWA] including notice and opportunity for public hearing."  Doc. 103 at 19, n.7.

requirements of the CWA are not included in the list.[59]  That the above discussed

permits (NWP 21 in <u>Ohio Valley</u>, the general permits in <u>Alaska Center</u>, and NWPs 14,

39, 40, 42, 43) apparently relied on special conditions to meet the CWA's minimal

effects determination is one basis to find that this list may simply be non-exhaustive.

Indeed, the Corps is permitted to consider mitigation to meet the legal requirements

of NEPA, yet NEPA is not among the "legal requirements" mentioned in this

regulation.  Additionally, an interpretation of § 325.4 that forbids legal requirements

other than those listed from being met by reliance on special conditions would conflict

with the mitigation regulation, 33 C.F.R. § 320.4(r)(2) (stating that mitigation will be

used for "significant resource losses"), which, as explained above, must mean that

mitigation can and should be used where the adverse environmental effects are more

than minimal.  Moreover, 33 C.F.R. § 320.4(r)(1)(ii) states that "mitigation measures

may be required to satisfy legal requirements" and with this regulation, there is no list

of which requirements can be met with mitigation.  A reading of § 325.4 which restricts

it to the list offered could therefore create a conflict with § 320.4(r)(1)(ii).  Thus, the

Court determines that § 325.4 does not prevent the Corps from basing its CWA

minimal effects determination on the permit's special conditions, including mitigation.

––––––––––––––––––––

[59]33 C.F.R. § 325.4(a)(1) states that the "[l]egal requirements which may be satisfied by means of Corps permit conditions include compliance with the 404(b)(1) guidelines, the EPA ocean dumping criteria, the Endangered Species Act, and requirements imposed by conditions on state section 401 water quality certification.

Plaintiffs also reference 33 C.F.R. § 325.5(c)(1). This regulation, which describes the class of permits at issue here- - regional general permits[60]- - explains that while the Corps can require a case-by-case reporting and acknowledgment system with a regional general permit if necessary, "no separate applications or other authorization documents will be required." 33 C.F.R. § 325.5(c)(1) (emphasis added).[61] The Court has found no case law or other authority interpreting this regulation or discussing its application and the parties have cited none. Plaintiffs have raised this regulation in passing[62] as support for their argument that the CWA's

_____

[60]The only other regulation found by the Court that is specific to the regional general permitting program is 33 C.F.R. § 325.2(e)(2) which explains that regional permits are a type of general permit that are issued at the division or district level. The language of this regulation is consistent with the mandate of 33 C.F.R. § 325.5(c)(1) in that it states that a regional general permit must comply "with the other procedures of this regulation" and explains that "[a]fter a regional permit has been issued, individual activities falling within those categories that are authorized by such regional permits do not have to be further authorized by the procedures of this regulation." 33 C.F.R. § 325.2(e)(2) (emphasis added).

[61]Contained in the section "Forms of Permits," 33 C.F.R. 325.5(c)(1) reads as follows:
> *General Permits*-(1) *Regional permits.* Regional permits are a type of general permit. They may be issued by a division or district engineer after compliance with the other procedures of this regulation. If the public interest so requires, the issuing authority may condition the regional permit to require a case-by-case reporting and acknowledgment system. However, no separate applications or other authorization documents will be required.

[62]This regulation has not been a prominent feature of plaintiffs' challenges, mentioned briefly at oral argument on the preliminary injunction motion (Doc. 67 [transcript of Oct. 6, 2005 hearing] at p. 147) and in a post-hearing brief (Doc. 121 at

general permit provisions require the Corps to make all of its minimal effects determination before a permit is issued.  However, plaintiffs have not argued for the *enforcement* of this regulation; in fact, they have stated that, in issuing SAJ-86, "the Corps has not violated § 325.5(c)(1)."  Doc. 133 at 12.

The provisions of § 325.5(c)(1) are not mandated by the CWA.  Moreover, St. Joe, which will be the biggest user of the permit and the party primarily affected by the post-permit procedures of Special Condition 20(b), has voluntarily agreed to be bound by those requirements.  Other landowners likely to be affected are not parties to this lawsuit. Thus, to the extent the post-permit procedures of SAJ-86 create any potential conflict with this regulation, that conflict is of no moment or prejudice to any party in this case.  See Sierra Club v. Slater, 120 F.3d 623, 637 (6th Cir. 1997); U.S. Steel Corp. v. U.S. EPA, 595 F.2d 207, 215 (5th Cir. 1979).[63]

Satisfied that SAJ-86 meets the statutory requirements of the CWA and does not run afoul of the referenced regulations, the Court therefore now turns to plaintiffs' challenges to the underpinnings of the findings upon which the Corps relied in

———————————

8).

[63]In so concluding, the Court nevertheless rejects St. Joe's contention that SAJ-86's post-issuance procedures are merely ministerial.  See Doc. 131 at 13.  Rather, these post-permit procedures play a critical role in SAJ-86's compliance with the CWA, for the reasons discussed earlier in this opinion.  Moreover, as acknowledged by both the Corps and St. Joe, decisions by the Corps to authorize specific projects under SAJ-86 would be reviewable in court as a final agency action under the APA, 5 U.S.C. §§ 704, 706.  (Docs. 130 at 24, 131 at 23).

determining that the adverse environmental effects of the authorized activities would be minimal.

> **(c)** **Are the Corps findings regarding the scientific underpinnings of the minimal effects determinations, particularly as they relate to the Corps' mitigation strategy for SAJ-86, arbitrary and capricious?**

Plaintiffs argue that even if the Court finds the Corps is permitted to rely on the future implementation of special conditions, particularly mitigation, in arriving at the minimal impacts determination, the Corps' reliance here is arbitrary and capricious because the mitigation plans are too vague, the mitigation values assigned to destroyed wetlands lack scientific rigor, the mitigation restoration plan lacks ecological rigor and its monitoring is inadequate, and the required water quality certifications and stormwater treatment methods are accorded undue significance in assessing the effects to water quality.

> **(i)** **Are the Corps' mitigation plans impermissibly vague?**

Plaintiffs claim the Corps' mitigation plans are too vague because the permit contains only aspirational "preferences" as to where impacts from the Devil's Swamp and Breakfast Point basins will be mitigated; it does not contain any details regarding plans for the on-site mitigation of impacts to Lake Powell's wetlands; it does not sufficiently account for how non-St. Joe owners will mitigate their lost wetlands; and it does not prescribe the type of mitigation (i.e., restoration, preservation, creation) for

any impacts.  The Corps' response to each of these challenges is that, having already defined the parameters and limits of the impacts and the degree to which those impacts must be mitigated as well as the options for the location of mitigation activities, all of which is detailed at length in the Administrative Record, the Corps will determine the details regarding how each impact will be mitigated during the mandatory pre-authorization meeting.  See Ohio Valley, 429 F.3d at 500 (citing to 33 U.S.C. § 1344(e)(2) and explaining that Congress anticipated that in issuing general permits, the Corps would make its initial determinations "under conditions of uncertainty" and that "post-issuance policing" and possible modification or revocation of a permit could result where the permit's operation in fact resulted in greater than minimal impacts).  Indeed, the permit describes the percentage and type of wetlands to which impacts can occur throughout the permit region (Special Conditions 4, 5, 7, 8, 10, 17), explains how those impacts will be mitigated (Special Conditions 11, 12, 13, 14,[64] 15), and describes the procedure through which the Corps will ensure that the mitigation will be properly effectuated and maintained (Special Conditions 13, 14, 15, 16, 20, 21, 22, 23, 24). The record contains more than adequate analysis and specificity to support the Corps' mitigation strategy.  See, e.g., AR 18-42, 48-49,

---

[64]Although Special Condition 14 addresses the permit's conservation unit plans, mitigation measures used to enhance and restore wetlands in the conservation units can be used as mitigation credit for wetlands impacts in the same sub-basin. See Special Condition 11(a), 14(b)(1) and (5).  AR 3878, 3880.

80

1102-05, 1353-59, 1360-73, 2341-47, 2402-09, 3021-31, 3931-4090, 4091-4244, 4435-4500.[65]   Cf. Wyoming Outdoor, 351 F.Supp.2d at 1251-52 (stating that mitigation measures must be "detailed and justified by some evidence in the record that would support their efficacy" and finding that although permit required wetlands impacts be mitigated on a 1:1 basis, Corps acted arbitrarily and capriciously in finding permit would have no significant impact to wetlands when it failed to conduct any studies to determine whether mitigation would work, offered no plans for how such mitigation would be achieved, and had no mandatory monitoring plans).

### (ii)    Do the wetland functional values lack scientific rigor?

The Corps has divided wetlands in the SAJ-86 region into two types-- low quality and high quality-- and, relying on the Wetland Rapid Assessment Procedure ("WRAP"), has determined that for purposes of mitigation, impacts to low quality wetlands shall be valued at .65 functional units and impacts to high quality wetlands shall be valued at .92 functional units.  See Special Conditions 4, 11(d).  Plaintiffs contend that the value of wetlands for purposes of mitigation assessment depends on the size, location and function of the wetlands and that the WRAP methodology measures are therefore inappropriate for this permit because the Corps has failed to undertake the necessary evaluation to accord values to wetlands scattered across a

_____

[65]AR pages 4435-4500 (the Wetland Rapid Assessment Procedure manual) are not included in the CD-Rom of the record provided by the Corps but they are in the Court's file as Exhibit 5 to Doc. 52.

48,150 acre parcel of land.

The Corps, however, explains that its history of permitting experience in the Panhandle reveals that the wetlands are largely uniform due to decades of impact from silviculture activities. Additionally, the Administrative Record demonstrates that the tech team[66] devoted significant effort collecting and analyzing data to develop appropriate WRAP scores for wetlands, arriving at a division between high and low quality wetlands that accords appreciably higher value and protection to any wetland not impacted by silviculture or created by ditching. See, e.g., AR 17, 18-42, 48-49, 127, 309-10, 893-95, 898-900, 945-47, 1043-51, 1052-57. See also, Doc. 55, Exhibit A (Redmond affidavit) at ¶¶ 15-24, 27-28 (describing WRAP methodology and summarizing its application by tech team to RGP area). Finally, SAJ-86 requires a landowner to identify and delineate wetlands on each project site in accordance with specific procedures which are then reviewed by the Corps during the pre-application meeting. Special Condition 17, 20(a)(3)-(5). Thus, contrary to plaintiffs' contention that the process here is analogous to O'Reilly v. U.S. Army Corps of Engineers, 2004 WL 1794531, *5 (E.D. La. 2004), where the court found the administrative record

_____

[66]The "tech team" was a subset of the working group of representatives that developed SAJ-86 and was comprised of seven scientists from the various participating federal and state agencies, St. Joe and its consultant, as well as two other scientists who assisted with the mitigation assessment. See Doc. 55, Exhibit A at ¶¶ 5-6 (affidavit of Ann Redmond, St. Joe consultant and tech team member, describing tech team and its members' qualifications).

failed to provide any connection between the impacts and the proposed mitigation, the Corps' assessment of wetlands values in the SAJ-86 permit region is supported by the record and is, therefore, not arbitrary and capricious.  See Florida Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs, 374 F.Supp. 2d 1116, 1155-57 (S.D. Fla. 2005) (stating that Corps' assessment of wetlands impact is technical matter within its expertise and was supported where record showed Corps addressed relevant factors through WRAP and alternative methodology).  See also, Nat'l Audubon Soc. v. Hoffman, 132 F.3d 7, 17 (2nd Cir. 1997) (stating that studies or future monitoring can constitute substantial evidence to support Corps' proposed mitigation measures).[67]

### (iii)    Are the mitigation restoration plans adequate?

Plaintiffs claim the mitigation restoration plans lacks ecological rigor and their monitoring is inadequate.  Plaintiffs rely on reports criticizing the Corps' past history of unsuccessful efforts at overseeing mitigation.  However, the Corps states that its WRAP calculations account for "temporal loss of functioning" and the risk of failure (see, e.g., AR 3022, 3025, 3029, 3031, 3999-4000), and the WRAP calculations here will result in "no net loss of wetland functions" across the permit region.  The Corps

---

[67]Because the Corps' assessment of wetlands' impacts and their mitigation is a technical matter within its expertise, the Court considers only whether its decisions are supported by substantial evidence.  The Court's review of plaintiffs' contrary evidence (such as the affidavits from Dr. Daniel Childers) does not constitute a basis to find that the Corps has ignored an essential feature of the analysis.

additionally explains that mitigation failure rates are higher when mitigation occurs in pockets and that the watershed-based mitigation banks and conservation units here will provide for clustering of most mitigation, which will yield a higher degree of success.  See, e.g., AR 3355-56 (describing proposed plant mix for restoring the Devil's Swamp bank to its pre-silviculture character and explaining that proposal will yield a "healthy, integrated mosaic" of pre-silviculture communities throughout the bank, which is more important than prescribing a specific acre-by-acre planting scheme).  Moreover, the release of the mitigation credits is tied to the success of the mitigation measures (see AR 3931-4090; 4091-4244 (Mitigation Bank Instruments); Special Condition 11(e)), and can be monitored through the mitigation bank monitoring protocols (AR 4014-16, 4171-73), or through enforcement of Special Condition 12, which requires that compensatory mitigation on all projects "be maintained in perpetuity in the enhanced/restored ecological condition." AR 3879. The Court finds that substantial evidence in the record supports the Corps' mitigation restoration and monitoring plans for SAJ-86 and this issue does not, therefore, create a basis to find the Corps acted arbitrarily and capriciously.

### (iv)    Has the Corps adequately addressed the water quality issues for purposes of the CWA?

Plaintiffs contend that the Corps' determination that the permit would result in minimal adverse environmental effects is not sustainable because the Corps failed to adequately consider the effects to the water quality.  Plaintiffs claim that the Corps

failed to account for the varying types of impacts that different, as yet unknown, types of projects will produce (stating for example, that the effect on water quality created by runoff from a golf course's fertilizer will be quite different from the hydrological effects caused by paving over wetlands to create parking lots).  Plaintiffs also state the permit provides insufficient protection for Lake Powell, a fragile and rare coastal lake that has been designated as an "Outstanding Florida Water" and is therefore entitled to special protections.  Plaintiffs further claim the record does not show that the Corps followed the 404(b)(1) guidelines requirement that it set forth "in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the . . . biological components" of the aquatic environment (especially Lake Powell), considering the water circulation, fluctuation, salinity, suspended particulate, turbidity, contaminants and aquatic ecosystems of organisms.  40 C.F.R. § 230.11(b-e).  Finally, plaintiffs claim the Corps' reliance on the state's water quality certification, the permit's stormwater management plans and the EPA's "blessing" of the permit do not create a basis for the Corps to fail to conduct its own analysis to support its water quality findings.

In determining the cumulative effects to the aquatic environment for purposes of determining whether the environmental effects of authorized activities will be minimal, the Corps considers "the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or

fill material.  Although the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of the existing aquatic ecosystems." 40 C.F.R. § 230.11(g)(1).  The Corps is required to predict these effects "to the extent reasonable and practical" and is permitted to "collect information and solicit information from other sources about the cumulative impacts on the aquatic ecosystem" which information "shall be documented and considered during the decision-making process concerning the . . . issuance of a [g]eneral permit."  40 C.F.R. § 230.11(g)(2).  The Corps is also required to consider the secondary effects on the aquatic ecosystem, which are effects "associated with a discharge of dredged or fill materials, but [which] do not result from the actual placement of the dredged or fill material."  40 C.F.R. § 230.11(h)(1).  The Corps' determinations regarding these effects must be set forth in writing and should account for, <u>inter</u> <u>alia</u>, the effects on water circulation, fluctuation, salinity, suspended particulate, turbidity, contaminants and aquatic ecosystems of organisms.  40 C.F.R. § 230.11(b-e).

The Statement of Findings prepared in support of SAJ-86 acknowledges that wetlands and waters within the permit region (thus, including Lake Powell) would have direct, indirect and cumulative impacts from authorized activities.  AR 3804.  However, the Corps also determined that the water circulation, fluctuation, and salinity of

receiving waterbodies, including West Bay, Choctawhatchee River and Bay, Lake Powell, Camp Creek Lake and the Gulf of Mexico, would not experience any direct effects from SAJ-86 activities and any indirect effects would "be of a scale that will not measurably alter their ecological balance due to the size of the receiving waters and to the water quality protection measures required by [SAJ-86] and concurrent requirements of State permit/water quality certifications for individual projects." AR 3818. The Statement of Findings explains how the location and topography of the region and project limits imposed by the permit (such as the bar against severing jurisdictional wetlands) further support this determination. AR 3818. The Statement of Findings also explains that the state water quality certifications incorporated into the permit by special condition will require that sediment remain on-site during construction resulting in no significant release of any suspended particulates and no significant effect to the turbidity of receiving waters, wetlands, streams, or other waters adjacent to permitted impact areas. AR 3819. The Corps also found that the permit's clean fill requirement and stormwater treatment provisions will result in less contamination than the required state standards would allow. AR 3819. The Statement of Findings further states that the permit's mitigation strategy, including the mitigation banks and conservation units, will minimize the secondary effects to the aquatic ecosystem by consolidating development within the sub-basins, buffering high quality wetlands, and clustering ecological resources to improve wildlife corridors and

wetland and upland habitats.  AR 3819-20.  Based on this analysis, the Statement of

Findings offers the Corps' conclusion that the secondary and cumulative effects to the

aquatic environment will be minimal.  AR 3820.

A permit's inclusion of state water quality certification standards meets water

quality considerations for purposes of the CWA unless the EPA advises the Corps of

concerns regarding "other water quality aspects."  33 C.F.R. § 320.4(d).  Here, not

only does SAJ-86 include such certification standards but the EPA in fact endorsed

the permit, finding it provided more wetlands resource protection than other basins in

the Southeastern United States.  AR 3723-24.[68]  Although plaintiffs point to some

contrary evidence in the record suggesting that the stormwater treatment plans may

not be as effective in all situations (AR 1142, 1683), the Corps was an active

participant in the tech team meetings at which the EPA and DEP repeatedly

considered water quality issues and the Court will not disturb the Corps' determination

to rely on the state water quality certifications and stormwater management plan

requirements of the permit, standards which are higher than required by law,

particularly where the EPA's final opinion endorsed the permit.  See Florida Keys, 374

F.Supp.2d at 1156 (rejecting plaintiffs' challenge that Corps failed to adequately

evaluate stormwater treatment measures where resulting system exceeded minimum

---

[68]The Court rejects plaintiffs' assertion that the 404(b)(1) guidelines themselves are an advisory from the EPA regarding "other water quality aspects" that would prevent the Corps from relying on the state's water quality certification.

standards and would therefore improve water quality).

The record also shows that in addition to the water quality certification requirements, the Corps relied on its study of the geography and topography of the region and the mitigation strategy and other permit terms to support its determinations.  Finally, the record shows the Corps specifically considered effects to Lake Powell when it studied how the topography of the permit region and the permit terms (which specifically includes buffers to Lake Powell) would minimize such effects; it also positioned conservation areas such that Lake Powell headwaters would have further protection from the effects of development.[69]  See e.g., AR 3896, 958. As an Outstanding Florida Water, Lake Powell is also provided additional protection under Florida law and the permit extends the Outstanding Florida Waters stormwater treatment standards to all discharges in the entire Lake Powell basin.  AR 3819. Upon review, the Court finds the Corps' determinations regarding water quality are supported by substantial evidence in the record and are not, therefore, arbitrary and capricious.[70]

---

[69]Because the permit allows discharge into non-tidal waters only, direct discharges into Lake Powell and the other open water bodies in the region are not authorized by SAJ-86.  AR 3876.

[70]Based on this determination, the Court rejects all of plaintiffs' claims regarding the Corps compliance with any aspect of 40 C.F.R. § 230.11.

**(4)     Has the Corps followed the EPA's 404(b)(1) Guidelines in implementing the  CWA as it applies to SAJ-86?**

The 404(b)(1) guidelines (codified at 40 C.F.R. Part 230), are regulations promulgated by the EPA in conjunction with the Corps concerning CWA permitting for dredge and fill activities. 40 C.F.R. §§ 230.1, 230.2.  The CWA requires the Corps to evaluate the 404(b)(1) guidelines when issuing a general (or individual) permit.  33 U.S.C. §§ 1344(e)(1)(A), 1344(b).  The 404(b)(1) guidelines set forth regulations regarding compliance, testing, evaluation, and minimization of adverse effects and contain a variety of criteria to be considered (including the potential impact on human use characteristics and physical, chemical and biological characteristics of the aquatic ecosystem and special aquatic sites) to determine whether the benefits of proposed activities authorized by a permit outweigh the damage caused by those activities. See generally, 40 C.F.R. Part 230.  The Corps is required to evaluate all permits for compliance with the 404(b)(1) guidelines, 33 C.F.R. § 323.6(a), and must deny a permit application that does not comply with them.  33 C.F.R. § 320.4(a)(1).  Failure to follow the 404(b)(1) guidelines requires a remand to the Corps for consideration of the neglected guideline criteria.  Wyoming Outdoor, 351 F.Supp.2d at 1257.

Some of these guidelines are directly applicable to the Corps' minimal effects analysis and have already been addressed above.  However, the 404(b)(1) guidelines contain additional regulations that the Corps must follow even though they are not a direct part of the minimal effects equation.  Plaintiffs challenge whether the Corps has

90

followed certain of these additional regulations.

First, plaintiffs claim the Corps failed to comply with 40 C.F.R. § 230.7(a)(1) which includes as a condition of issuing a general permit that the activities authorized by such permit be "similar in their impact upon water quality and the aquatic environment." Plaintiffs explain that the types of discharges from the various activities authorized by SAJ-86 could be quite dissimilar (stating, for example, as noted above, that the effects of fertilizer used for a golf course could be quite different from the hydrological effects caused by a paved parking lot).   Plaintiffs also explain that the location of the activity within the vast RGP area could also affect how even the same activity could create different impacts on the aquatic environment (stating, for example, that the same golf course, if located near Lake Powell, could result in impacts that are dissimilar from impacts a golf course might have elsewhere in the region). See 40 C.F.R. § 230.7(b)(2) (directing Corps to consider whether similar activities will result in different impacts due to unique qualities of particular locations within permit area). The Corps responds that the uniformity of the wetlands (caused mainly by the effects of silviculture activities), combined with the permit conditions such as the stormwater management requisites, the fill type requirements, and the Lake Powell buffers, ensure that impacts to the aquatic environment will be similar and that even the effects of activities as diverse as golf courses and parking lots will

be similar throughout the SAJ-86 region.[71]  See Wyoming Outdoor, 351 F.Supp.2d at 1259-60 (finding Corps complied with 40 C.F.R. § 230.7(a)(1) where permit conditions rendered potentially dissimilar impacts similar).  The Court is satisfied that the Corps has adequately complied with this guideline requirement.

Next, plaintiffs claim the Corps failed to comply with 40 C.F.R. § 230.7(b)(2), which requires the Corps to reach its evaluation for issuance of a general permit by "set[ting] forth in writing an evaluation of the potential individual and cumulative impacts of the category of activities to be regulated under the [g]eneral permit" "includ[ing] a precise description of the activities to be permitted under the [g]eneral permit, explaining why they are sufficiently similar in nature and in environmental impact to warrant regulation under a single [g]eneral permit based on subparts C through F of the [404(b)(1)] Guidelines."  40 C.F.R. § 230.7(b) and (b)(2).

The permit and the Statement of Findings list *examples* of activities that could be authorized by the permit and, while the Court is satisfied that the authorized category of activities are "similar in nature" (based on the Corps' reliance on the special conditions of the permit which will serve to enforce the similarity), 40 C.F.R. § 230.7(b)(2) requires a "precise description of the activities" themselves.  The Court does not find such a description and does not accept the Corps' statement that this

---

[71]Unlike the CWA requirements, there is no dispute that a permit's special conditions can be considered to satisfy the 404(b)(1) guideline requirements.  33 C.F.R. § 325.4 (a)(1).

regulation is satisfied by its record statement that the activities are similar in nature because they "essentially involve the placement of fill material into two pre-identified and evaluated classes of wetlands for the construction of various components that typically comprise suburban development."   AR 3856, Doc. 130 at 19-20.   As discussed at length above, the Court is barely satisfied that the activities *are* similar in nature- - the language cited by the Corps hardly supports any "precise description of the activities" as the regulation requires.

Additionally, the Court has combed the Statement of Findings and does not find any explanation as to "why [the activities] are sufficiently similar in nature and in environmental impact to warrant regulation under a single [g]eneral permit based on Subparts C through F" and here too, finds unacceptable the Corps' explanation that the Statement of Findings demonstrates consideration of Subparts C through F of the 404(b)(1) Guidelines. While the Court agrees that the record demonstrates the Corps' consideration of Subparts C through F, the regulation requires the Corps to explain, in writing, <u>why</u> the proposed activities are sufficiently similar in nature and in environmental impact to warrant regulation under a single general permit.  Based on the Court's analysis above, the Court might venture to explain how the activities could meet this requirement, but the guidelines require that the Corps do the explaining- - in writing.

However, the Court finds the error to be harmless; the Corps has made the necessary evaluations as to warrant use of a general permit, in light of the 404(b)(1) considerations, and in compliance with the statutory requirements of the CWA.  The Court has no doubt that a remand on this basis would lead to an easy cure by the insertion of language that would meet the requirements of 40 C.F.R. § 230.7(b)(2). As St. Joe describes, it would be an unnecessary exercise in "wordsmithing."  The Court agrees.  See U.S. Steel v. U.S. EPA, 595 F.2d 201, 215 (5th Cir. 1979) (clear absence of prejudice may warrant application of prejudicial error doctrine); Sierra Club v. Slater, 120 F.3d 623, 637 (6th Cir. 1997) (affirming EPA decision where regulations' violation resulted in no prejudice); 5 U.S.C. § 706.

Plaintiffs also state that the Corps has failed to comply with 40 C.F.R. § 230.7(b)(3) which requires the Corps to base its prediction of cumulative effects on an evaluation which "shall include the number of individual discharge activities likely to be regulated under a [g]eneral permit until its expiration, including repetitions of individual discharge activities at a single location."  Here, although the Statement of Findings does not include an estimate of the number of individual discharge activities or their likely repetition, the Court finds the Corps has substantially complied with this requirement by including in the Statement of Findings tables showing the limits to the acreage impacts for each sub-basin. AR 3843-3845.  Thus, even if the actual number of discharge activities is not predicted, their effect is.  Moreover, because SAJ-86

limits the acreage impacts by sub-basin, any prediction of the number of individual discharges would not assist the Corps in determining the cumulative effects, which 40 C.F.R. § 230.7(b)(3) describes as its purpose.  Thus, any error in the Corps' failure to follow this guideline to the letter is harmless.  Sierra Club v. Slater, 120 F.3d at 637.

Finally, plaintiffs claim the Corps failed to adequately consider 40 C.F.R. § 230.10(a), which requires the Corps to consider alternatives to the proposed permit, and particularly 230.10(a)(3), which creates a presumption against authorizing non-aquatic dependent activities.   However, 40 C.F.R. § 230.7(b)(1) explains that "consideration of alternatives in § 230.10(a) are not directly applicable to [g]eneral permits."   Nonetheless, the Corps has complied with § 230.10(a)'s alternatives analysis,  and the Statement of Findings explains the Corps' consideration of alternatives to the proposed action.   AR 3815-17 (describing Corps' review of "[v]arious alternatives" including "the no action alternative, review of individual projects with the establishment of mitigation banks, and enacting the [permit]").  See also AR 3855 (describing individual permitting experience in southwest Florida which has led to undesirable effects). The Court is also satisfied that to the extent the Corps was required to consider 230.10(a)(3)'s presumption against non-aquatic dependent activities, the Corps has done so by relying on its history of permitting in the region, which the record shows has revealed that the area is "virtually undevelopable" without

95

authorizing discharge into wetlands.  AR 3804.[72, 73]

**B.    SAJ-86's Compliance with the National Environmental Policy Act**

NEPA requires federal agencies proposing any "major [f]ederal actions significantly affecting the quality of the human environment" to prepare a detailed written environmental impact statement, an "EIS."  42 U.S.C. § 4332(2)(C).  The purpose of an EIS is two-fold:  first, it forces the agency to take a "hard look" at the environmental consequences before resources are committed and; second, it gives the public assurance that the agency has considered environmental concerns. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349-50 (1989).  "'NEPA itself does not mandate particular results'" but, rather, "imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impacts of their proposals and actions." Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 756-57 (2004) (quoting Methow Valley,

---

[72]Plaintiffs' challenges to the Corps' alternatives analysis under NEPA are addressed below.

[73]The Corps' consideration of the public interest review factors (see 33 C.F.R. § 320.4(a)) incorporates much of the same analysis as its 404(b)(1) guidelines analysis as it pertains to the public interest review's aquatic environment factors. Consideration of those and the other public interest review factors is satisfied by the Statement of Findings which shows the Corps' analysis of these factors and its reliance on the opinions of other interested agencies that approved the permit.  AR 3839-55.  The Court finds the Corps' determinations in this regard are supported by substantial evidence and plaintiffs' challenges that the Corps failed to comply with the public interest review criteria are therefore rejected.

490 U.S. at 349-50).

To determine whether an agency needs to perform an EIS, the agency prepares an environmental assessment ("EA") discussing the need for the proposed action, alternatives, and the environmental impacts of the proposed action and alternatives.   40 C.F.R. § 1508.9; Hill v. Boy, 144 F.3d 1446, 1449-50  (11th Cir. 1998).   In the EA, the agency must consider the direct, indirect and cumulative impacts of proposed activities as well as the significance of those impacts on the human environment.  40 C.F.R. §§ 1508.7, 1508.8, 1508.27(b).  Based on the EA, and consulting regulations promulgated by the Council on Environmental Quality ("CEQ"), the agency will then either prepare an EIS or issue a Finding Of No Significant Impact ("FONSI").  Hill, 144 F.3d at 1449-50.  A FONSI is permitted only if the proposed action will not significantly affect the environment, 40 C.F.R. § 1508.13, and the FONSI determination must be supported by a statement of reasoning and evidence, not merely conclusions.  Hill, 144 F.3d at 1450 (explaining that CEQ regulations assist agency to prepare an EA that briefly provides sufficient information and analysis to determine whether to issue an EIS or a FONSI); Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 864-65 (9th Cir. 2005); American Canoe Ass'n v. White, 277 F.Supp.2d 1244, 1258-59 (N.D. Ala. 2003). However, the EA itself need not be nearly as comprehensive as an EIS but rather is a "concise public document" that serves to "[briefly provide sufficient evidence and

analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a).  As explained by one court, "[a]n environmental assessment is a rough-cut, low budget environmental impact statement designed to show whether a full-fledged environmental impact statement- - which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project- - is necessary."  Cronin v. U.S. Dep't of Agriculture, 919 F.2d 439, 443 (7th Cir. 1990).

Here, the Corps prepared an EA and the Corps' SAJ-86 Project Manager, Gordon A. Hambrick, III, issued a FONSI determination approved by the Corps' then Commanding Colonel Robert M. Carpenter, which states:  "Having reviewed the information provided by the applicant and all interested parties and an assessment of the environmental impacts, I find that this permit action would not have a significant impact on the quality of the human environment.  Therefore, an [EIS] would not be required."  AR 3870-71.

The Court's review of the Corps' FONSI decision is under the arbitrary and capricious standard.  Sierra Club v. U.S. Army Corps of Eng'rs, 295 F.3d 1209, 1216 (11th Cir. 2002); Hill, 144 F.3d at 1450.  As part of this review, the Court looks beyond the final decision documents (here, the Memorandum for Record/Statement of Findings, AR 3801-73) to the entire record to ensure that the Corps took the requisite "hard look" at the evidence.  Sierra Club, 295 F.3d at 1216.  "An agency [meets] its

'hard look' requirement if it has 'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Id. (quoting Motor Vehicle Mfrs., 463 U.S. at 43). Though usually not considered, extra-record material may be relevant in determining whether the Corps has in fact considered all the relevant data in arriving at its decision. Hill, 144 F.3d at 1450, n.11; Sierra Club v. Flowers, 423 F.Supp.2d 1273, 1282 (S.D. Fla. 2006) (determining whether the agency took a hard look may sometimes require Court to look beyond the record to see what the agency may have ignored). However, when addressing a claim that the Corps has not properly weighed the evidence, the court must be highly deferential because "an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989). While this is particularly true where the evidence is "technical" or "scientific," the Court must nonetheless be satisfied that the Corps' decision is grounded in "a reasoned evaluation of the relevant factors." Id. (quotations and citation omitted). See also, Friends of the Earth v. Hall, 693 F.Supp. 904, 922 (W.D. Wash. 1988) (stating in context of NEPA review that "[a] federal court is not in the business of resolving scientific disagreements between plaintiffs' experts and the Corps' experts" but must "[n]evertheless . . . ensure that the Corps . . . adequately considered and disclosed the environmental impact of the . . .

project"). If the Court finds the agency's review is deficient, the appropriate remedy is a remand to the Corps for reconsideration. Sierra Club, 295 F.3d at 1216.

Plaintiffs claim the Corps failed to take a "hard look" because the decision documents contain insufficient analysis, the Corps' consideration of wetlands impacts was inadequate and the Corps failed to take a hard look at other aspects of the human environment affected by the proposed activities, particularly waterbodies. Plaintiffs further claim the evidence does not support issuance of a "mitigated FONSI" and the Corps failed to engage in an appropriate analysis of alternatives.

### (1) Did the Corps take a "hard look" at the evidence to reach its FONSI determination?

The Statement of Findings (AR 3801-73) is the Corps' EA. In it, the Corps recognizes that the construction and operation of the various activities authorized by SAJ-86 will "have direct, indirect and cumulative impacts on onsite wetlands and waters[,] but no direct and only minimal indirect impact on aquatic resources outside the RGP area, which include wetlands and receiving waterbodies." AR 3804. The Corps further explains that the landscape scale of SAJ-86's development plan would result in consolidated development over approximately 5% of the wetlands and the creation of an enhanced network of wildlife corridors and significant wetland and upland habitats, preserving the linkage of ecological resources from Choctawhatchee Bay to West Bay. AR 3820. The Corps also found that cumulative impacts of stormwater runoff to receiving waters would be minimized by SAJ-86's more stringent

stormwater standards.  AR 3820.  The Corps acknowledged that wetlands and other waters in the RGP area and wetlands and other waters adjacent to and downstream of the RGP area would experience secondary effects from authorized projects including changes in the water circulation and flow patterns, changes in stormwater runoff volumes and quality, release of leachate from septic tanks, and reduction in the habitat size and/or connectivity for species that are dependent on or use the aquatic environment.  AR 3820.  The Corps found, however, that those secondary effects would be minimal because SAJ-86 provides more stringent stormwater treatment standards than currently required in the area, and the fill placement restrictions would prohibit the installation of drainfields and septic tanks. AR 3820-21.  Additionally, land management within the conservation units would change the usage from intense silviculture to selective timbering and land management which will enhance conservation and habitat restoration.  AR 3821.  Finally, the use of one of the conservation units for effluent discharge from Panama City Beach's wastewater treatment facility would eliminate the current direct discharge of that effluent into West Bay.  Id.  Upon these findings, the Corps issued its FONSI determination.  AR 3870.

Plaintiffs claim the Corps failed to take a "hard look" at the evidence because the EA contains inadequate analysis to support a FONSI determination, the Corps erred by confining its analysis to wetlands, and the Corps' analysis of impacts to wetlands is itself inadequate.  Upon consideration of the EA, and for many of the

reasons articulated above in the analysis of plaintiffs' CWA claims, the Court is satisfied that the Corps has taken the requisite "hard look."  The Corps considered and evaluated the direct, indirect, and cumulative impacts to wetlands and other waterbodies both in and adjacent to and downstream of the permit region.[74]  Over 4500 pages of record substantiate the Corps' and other interested agencies' long process[75] of fashioning a permit that would allow the dredge and fill of wetlands to accommodate residential and commercial development growth while maximizing protection of wetlands on a watershed basis and minimizing other impacts.  Simply put, the Corps did not need NEPA to remind it to take a hard look at the impacts of its actions.  Rather, the Administrative Record establishes that the whole permit process

------

[74]  Other than waterbodies, plaintiffs have not raised specific challenges to the adequacy of the Corps' evaluation of any additional features of the human environment to which NEPA applies.  Moreover, as explained by NEPA's implementing regulations, in addition to the evaluation of direct and indirect impacts (defined as the effects which are caused by the action at the same time and place as well as the forseeable effects which may reasonably occur at a later time or at a more distant place), the Corps' consideration of cumulative impacts is limited to the "impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably forseeable future actions regardless of what agency . . . or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. §§ 1508.7, 1508.8.  The Administrative Record illustrates that the Corps considered the opinions of other interested agencies, including the EPA, in evaluating impacts to other aspects of the environment.  See, e.g., AR 3806-10 (describing involvement of various government agencies that were represented on interagency team that developed permit).

[75]St. Joe and its consultants participated in this process too.

bespeaks the Corps' consideration of the direct, indirect and cumulative impacts of

the authorized activities.  The permit conditions are crafted to try to ensure that the

development and its impacts, as well as the conservation efforts, conform to the

Corps' vision for the watershed-based ecologically-focused development for this

region.  See, e.g., AR 6-7, 16-17, 18-42, 48-49, 54, 79-86, 91-92, 93-99, 108-09, 111-

15, 116, 117, 205-06, 207-11, 212, 214-22, 230-59,  296-99.[76]

   This case is therefore unlike Hill v. Boy, 144 F.3d 1446, 1451 (11th Cir. 1998),

Wyoming Outdoor, 351 F.Supp.2d at 1241-43, American Canoe Ass'n v. White, 277

F.Supp.2d 1244, 1257 (N.D. Ala. 2003), or Defenders of Wildlife v. Ballard, 73

F.Supp.2d 1094, 1114 (D. Ariz. 1999), where, in each case, the Corps failed to take

a hard look at the evidence when it instead relied on hopeful assumptions regarding

anticipated actions by other agencies or deferred consideration of certain impacts until

a later event occurred.  Additionally, in this case, the Corps' FONSI conclusion is

supported by its consideration of the public interest review factors and by its 404(b)(1)

---

   [76]These are relevant selections taken from just the first 300 pages of the record.
The Court specifically rejects plaintiffs' contention that the Corps failed to take a hard
look at the impacts to waterbodies and water quality issues.  As with its CWA
analysis, here too the Court finds the EPA's "endorsement" of the permit and SAJ-86's
special conditions, including the required water quality certifications, buffering, bar
against jurisdictional wetland severance, fill specifications and specific stormwater
treatment plans, sufficiently address those impacts.  See Wyoming Outdoor, 351
F.Supp.2d at 1256.  Additionally, the Corps' participation with the EPA and DEP
throughout the permit development process reveals that the Corps took the requisite
"hard look" at this issue.  The Court therefore finds the facts here are distinguishable
from the cases upon which plaintiffs rely regarding the water quality issue.

guidelines analysis, through which the Corps evaluated cumulative, indirect and direct impacts to reach the CWA determination that the adverse environmental effects of authorized activities would be minimal.  <u>See</u> 40 C.F.R. § 1500.4(k) (encouraging the integration of NEPA requirements with other environmental review and consultation requirements).

Moreover, because the Corps is relying on mitigation and other special conditions of the permit to reach the determination that the effects will be minimal (particularly as to impacts to wetlands), "the Corps' obligation to discuss those impacts is lessened."  <u>Wyoming Outdoor</u>, 351 F.Supp.2d at 1247 (stating that mitigation plan can obviate need to evaluate impacts) (citing <u>Holy Cross Wilderness Fund v. Madigan</u>, 960 F.2d 1515, 1526 (10th Cir. 1992)).  Thus, the Corps was not required to further discuss the direct, indirect and cumulative effects of SAJ-86, all of which the Corps argues would be ameliorated by special conditions including mitigation.  Accordingly, while there is certainly some appeal in plaintiffs' contention that on its face, any permit which allows impacts to 1500 acres of wetlands necessarily creates a "significant" impact (thus precluding issuance of a FONSI), NEPA does permit consideration of whether mitigation ameliorates impacts to a level below the EIS threshold of significance.  <u>Envtl. Prot. Info. Ctr. v. U.S. Forest Service</u>, 451 F.3d 1005, 1015 & n.6 (9th Cir. 2006) (citing CEQ's "Forty Questions" memorandum, which explains that where mitigation measures are integrated into

proposal such that proposal cannot be defined without reference to mitigation, the mitigation measures may be considered in evaluating whether impacts are significant for purposes of issuing an EIS).   Therefore, assuming that the permit's special conditions do indeed ameliorate the adverse impacts of the proposed activities (discussed below), the Court is satisfied that the Corps took the requisite "hard look" at the evidence in arriving at its FONSI determination.[77]

### (2)   Does the evidence support a "mitigated FONSI" ?

In relying on mitigation as part of the Corps' assessment of the "no significant impact" finding, the Corps has made a "mitigated FONSI" finding, which permits the Corps to acknowledge that a project will have significant environmental effects but that the effects will be mitigated, thus allowing issuance of a FONSI in lieu of a full-blown EIS.   Spiller v. White, 352 F.3d 235, 241 (5th Cir. 2004).   See also, C.A.R.E. Now, Inc. v. F.A.A., 844 F.2d 1569, 1575 (11th Cir. 1988) (finding FAA's imposition of pre-construction mitigation would bring impacts of airport runway extension below EIS threshold); Envtl. Prot. Info. Ctr., 451 F.3d at 1015.   However, the Corps' reliance on mitigation must be justified.   "First, the mitigation measures must be more than a possibility" meaning they "must be imposed by statute or regulation or have been so integrated into the initial proposal that it is impossible to define the proposal without

---

[77] That the size or scope of the authorized activities and their impacts alone would preclude issuance of a FONSI is belied by the Corps' 2002 issuance of a FONSI determination for the entire NWP program.   See 67 Fed.Reg at 2025.

the mitigation." <u>Wyoming Outdoor</u> 351 F.Supp.2d at 1250.  <u>See also</u>, <u>C.A.R.E. Now</u>, 844 F.2d at 1575 (rejecting petitioner's claim that mitigation measures were too speculative where FAA imposed mitigation as condition precedent to runway construction); <u>Envtl. Prot. Info. Ctr.</u>, 451 F.3d at 1015 (finding reliance on mitigation appropriate to reach FONSI finding because mitigation measures were incorporated into proposed plan of action rather than being developed in response to it).  Here, like in <u>Wyoming Outdoor</u>, the mitigation measures are a "mandatory condition" of the permit and therefore "qualify as the type of mitigation measures that can be relied upon for a finding of no significant impact."  351 F.Supp.2d at 1250.

"Second, the mitigation measures relied upon must constitute an adequate buffer so as to render such impacts so minor as to not warrant an EIS."  <u>Id.</u> (quotations and citations omitted).  "In other words, when the adequacy of proposed mitigation measures is supported by substantial evidence, the agency may use those measures as a mechanism to reduce environmental impacts below the level of significance that would require an EIS."  <u>Id.</u> (quotations and citations omitted).  "In practice, mitigation measures have been found to be sufficiently supported when based on studies conducted by the agency, or when they are likely to be adequately policed."  <u>Id.</u> (quotation and citation omitted).

In <u>Wyoming Outdoor</u>, the court found the mitigation measures deficient where no scientific evidence in the record supported a conclusion that the mitigation

measures would be successful, where the only assurance was the permit condition

that wetlands be replaced at a 1:1 ratio, and where the record contained various

comments from parties (such as Fish and Wildlife) questioning the efficacy of the

mitigation measures.  Id. at 1252.  Nor did the Corps' proposed monitoring give the

court adequate assurance, as the permit contained "no specific [monitoring] plan." Id.

The Wyoming Outdoor court therefore found the Corps' reliance on mitigation to

support its FONSI was arbitrary and capricious and remanded for findings in support

of reliance on mitigation.  Id.  See also, O'Reilly, 2004 WL 1794531, *5-6 (enjoining

permit where EA failed to explain any connection between mitigation and wetlands

impacts).  Cf., Wetlands Action Network, 222 F.3d 1105, 1121 (9th Cir. 2000)

(sustaining Corps' FONSI finding notwithstanding that complete mitigation plan not

set forth with specificity at time of permit issuance because, in lieu of detailed plan,

special conditions of permit ensured mitigation goals would be met).

    Here, the Court has found that the mitigation is scientifically supported (see

above analysis under CWA) and sufficiently enforceable through the permit's special

conditions.  While the plaintiffs have offered contrary evidence as to both of these

points, the record provides substantial evidentiary support for the Corps'

determination.  See C.A.R.E. Now, 844 F.2d at 1575 (discussing evidence that

supported FAA's conclusion that with mitigation measures in place, effects of project

would be insignificant).  See also, Sierra Club, 295 F.3d at 1220-21 (in context of

107

determining whether Corps should have issued supplemental EIS, finding Corps had "full picture of the environmental consequences" of proposed action and appropriately relied on project's required mitigation measures to determine that environmental impacts were no longer significant).

### (3)    Did the Corps complete an appropriate alternatives analysis?

Like the CWA, NEPA requires the Corps to consider alternatives to the proposed action.  Although the regulation describing the alternatives analysis (40 C.F.R. § 1502.14) appears in the section detailing the contents of an EIS, an EA, which is essentially an abbreviated EIS, must contain an alternatives analysis as well. See 40 C.F.R. § 1508.9 (EA "should include brief discussions of . . . alternatives as required by [42 U.S.C. § 4332(2)(E)] . . . [and] environmental impacts of . . . alternatives");  40 C.F.R. § 1500.2(e) (explaining that federal agencies should use NEPA process "to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment").  See, e.g., C.A.R.E. Now, 844 F.2d at 1574 (discussing whether EA contained appropriate alternatives analysis).[78]

_____

[78]While St. Joe maintains that 40 C.F.R. §230.10(a)(4) permits the Corps to rely on its 404(b)(1) guidelines analysis of alternatives to satisfy its NEPA alternatives obligation, that regulation actually suggests the reverse, stating that the Corps' NEPA alternatives findings may satisfy the 404(b)(1) guidelines analysis of alternatives.

The Corps did present an analysis of alternatives in the EA, stating that "[v]arious alternatives were reviewed . . . [which] included the no action alternative, review of individual projects with the establishment of mitigation banks, and enacting the RGP." AR 3815. The Corps prefaces its alternatives discussion in the EA by stating that (1) it had been advised by St. Joe, the largest landowner in the region, that it was converting its business plan from silviculture/pulp mill operations to commercial and residential development; (2) that the region where the proposed development would take place is environmentally pristine with little development when compared to other parts of Florida; (3) that the landscape would become fragmented and densely developed without some proactive environmental approach; and (4) that certain protected species would benefit from the preservation of large, unfragmented areas. AR 3815-16.

The EA then describes each alternative, explaining first that the no action alternative (which would mean that each permit application would be evaluated on an individual basis as received) would result in no conservation units, mitigation banks or interconnected preservation of wetlands and uplands; small-scaled scattered mitigation projects; more uplands development; less consistent surveying of endangered species and cultural resources; and less predictability as to secondary and cumulative effects. AR 3816. The individual permitting with mitigation banks alternative (which would be the same as the no action alternative, except that, as

opposed to having all mitigation performed on-site, mitigation banks would be created in larger, higher quality and geographically desirable areas to compensate for adverse wetlands impacts) would result in no conservation units, fewer areas of guaranteed preservation, scattered preservation throughout the region, and St. Joe, the likely sponsor of the mitigation banks, "was not interested in establishing mitigation banks for use by other landowners without a regional general permit." AR 3816. The EA next describes the RGP as proposed, expounding on its favorable ecological features, including, inter alia, the buffering of high quality wetlands, the creation of geographically contiguous conservation units and mitigation banks which would be placed in the most environmentally sensitive areas of the region, the additional protection provided to endangered species and cultural resources by virtue of the regional, comprehensive (and less costly) review process, and the predictability of the secondary and cumulative impacts. AR 3817.

Plaintiffs claim the Corps' analysis of alternatives in the EA is inadequate because it has no genuine discussion of alternatives, but instead summarily dismisses the concept in a few paragraphs, stating in essence that St. Joe wants to develop its properties, the area will therefore be developed, and this regional general permit is the better way to handle the development. See, e.g., Tr. 244-46. Citing various CEQ regulations, cases, and examples of alternatives analyses from other permits, plaintiffs claim that the law requires deeper analysis and consideration of more

110

alternatives than what the Corps has provided here.

The CEQ regulations and many of the cases presented by plaintiffs on this issue are in the context of an EIS.  However, the level of analysis required by NEPA in an EIS is more rigorous than is required when the Corps has determined on the basis of its EA that the project as proposed will not result in significant environmental impact.  See Native Ecosystems Council v. U.S. Forest Service, 428 F.3d 1233, 1246 (9th Cir. 2005) (citing cases from the Second, Fourth and Fifth Circuits, and stating "we join our sister circuits in holding that an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS").  See also, Save Our Cumberland Mountains v. Kempthorne, 453 F.3d 334, 342 (6th Cir. 2006) ("an agency has fewer reasons to consider alternatives when it prepares an environmental assessment as opposed to when it prepares an environmental impact statement"); Mt. Lookout-Mt. Nebo Prop. Prot. Ass'n v. Fed. Energy Regulatory Comm'n, 143 F.3d 165, 172 (4th Cir. 1998) ("The rigor with which an agency must consider alternatives is greater when the agency determines that an EIS is required for a particular federal action."); Missouri Mining, Inc. v. Interstate Commerce Comm'n, 33 F.3d 980, 984 (8th Cir. 1994) ("It would be something of an anomaly to require that an agency search for more environmentally sound alternatives to a project which it has determined will have no significant environmental effects anyway.") (citations and quotations omitted).  Thus, the Court declines to hold the Corps' alternatives analysis here to the standard

plaintiffs seek.[79]

That leaves the question, however, of what standard should be applied in weighing alternatives under an EA.  From a review of the relevant case law, the Corps need do no more than what § 1508.9 describes- - provide a "brief discussion" of the alternatives it considered and their environmental impacts.  <u>See, e.g.</u>, <u>Native Ecosystems</u>, 428 F.3d at 1246.  At that point, the Corps' evaluation will be upheld if it demonstrates that it has made a "reasoned choice," even if it has not selected what the court would deem as "the best alternative." <u>C.A.R.E. Now</u>, 844 F.2d at 1574.  The first part of making a "reasoned choice" is selecting alternatives that relate to the purpose of the general permit.  <u>Colorado Envtl. Coal. v. Dombeck</u>, 185 F.3d 1162, 1174 (10th Cir. 1999) (an agency's consideration of reasonable alternatives gives agencies "responsibility for defining the objectives of an action and then provid[ing] legitimate consideration to alternatives").  Here, the EA states that the purpose of the permit is to regulate the "[c]onstruction of residential, commercial, recreational and

---

[79]Although the Eleventh Circuit's decision in <u>C.A.R.E. Now</u>, 844 F.2d 1569 reviewed the alternatives analysis in an EA (<u>Id.</u> at 1574), the opinion does not discuss if or how the standard varies from that used in considering alternatives in an EIS. The one case in this portion of the analysis upon which the Eleventh Circuit relied, (<u>Life of the Land v. Brinegar</u>, 485 F.2d 460, 475 (9th Cir. 1973)) was an EIS case, lending some credence to the possibility that the Eleventh Circuit would hold the agency's alternatives analysis to the same standard in an EA as in an EIS.  However, in light of the abundant authority from other Circuits that have actually examined this issue, the Court declines to presume just from this single citation in <u>C.A.R.E. Now</u> that the Eleventh Circuit has adopted a different view.

institutional projects . . . within an area of rapid residential and commercial development, while protecting the aquatic environment on a watershed scale." AR 3803.[80]  The Corps then briefly detailed the three alternatives it considered as having the ability to address the purpose of its project.[81]  Plaintiffs have not offered any particular suggestion of any alternative the Corps failed to consider, but they do argue that the Corps erred in rejecting the "no action" alternative on the grounds that, if properly implemented, the individual permitting process can adequately protect wetlands.  The Corps, however, rejected that alternative both because of its experience in South Florida which the Corps felt left wetlands insufficiently protected (AR 3816) and because individual permitting would fail to provide the clustering of conservation and preservation that the region deserved and which could be accomplished through the terms and conditions of the regional general permit fashioned here (AR 3815-17).  The Court finds the Corps did not violate NEPA in

――――――――――――――

[80]While an agency is accorded discretion to define the purpose of the project, it abuses its discretion where it defines the project's purpose so narrowly that only the favored proposal could meet its needs. Simmons v. U.S. Army Corps of Eng'rs, 120 F.3d 664, 668-69 (7th Cir. 1997).  To the extent plaintiffs' challenges regarding the Corps analysis of alternatives could be construed as alleging this criticism, the Court rejects that challenge, finding that the purpose of the permit is legitimately defined to allow a discussion of real alternatives.

[81]Appropriate record evidence supports the Corps' consideration of the alternatives. See, e.g., AR 56-57, 968, 3855.

rejecting the "no action" alternative.[82]

The Court therefore finds that the Corps complied with NEPA and its attendant regulations in issuing SAJ-86.

## IV.  Conclusion

The Corps was faced here with an unprecedented situation in trying to regulate a relatively homogeneous, contiguous 48,150 acre parcel owned largely by one entity, with wetlands interspersed throughout.  It has responded to this unique scenario with SAJ-86, which represents a non-traditional use of the Corps' permitting authority under the Clean Water Act, a use which the Court finds is at, but not beyond, the outer limits of that authority.

For the reasons stated, the Court rejects plaintiffs' CWA and NEPA challenges to the Corps' issuance of SAJ-86.  Judgment is due to be entered in favor of the Corps on all of plaintiffs' claims.

It is hereby

**ORDERED**:

1.    The Order of Preliminary Injunction (Doc. 72) is **VACATED**.

2.    In Case No. 3:05-cv-362-J-32TEM, final judgment will be entered in favor

_____

[82]Moreover, because the permit here is a general permit, an alternatives analysis that explores any site specific considerations or the physical placement of any particular project (as was considered in the individual permit alternatives analysis samples provided by plaintiffs) is simply inapplicable.

114

of defendants United States Army Corps of Engineers, et al., and against plaintiff Sierra Club; in Case No. 3:05-cv-459-J-32TEM, final judgment will be entered in favor of defendants United States Army Corps of Engineers, et al., and against plaintiff Natural Resources Defense Council.

      3.      The Clerk should close the file.

      **DONE AND ORDERED** at Jacksonville, Florida this 19th day of November, 2006.

TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:

counsel of record